Filed 9/8/22  P. v. Robinson CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LARRY WAYNE ROBINSON, <br><br> Defendant and Appellant. | F082378 <br><br> (Super. Ct. No. PCF397760) <br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Michael A. Canzoneri and Tia M. Coronado, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

Based on two separate incidents in May 2020, defendant Larry Wayne Robinson was charged with two felony counts of making criminal threats against T.C.,[1] his former girlfriend (Pen. Code, § 422; counts 1, 3)[2]; one felony count of making a criminal threat against J.S., another woman (§ 422; count 4); two misdemeanor counts of contempt of court by violating a protective order issued pursuant to section 136.2 (§ 166, subd. (c)(1); counts 2, 5); one misdemeanor count of resisting or obstructing a peace officer (§ 148, subd. (a)(1); count 6); and one misdemeanor count of possessing drug paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 7). As to counts 1, 3, and 4, the amended information alleged defendant suffered eight prior felony convictions within the meaning of section 1203, subdivision (e)(4); and suffered a prior conviction under section 422, qualifying as a prior strike offense within the meaning of the Three Strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction within the meaning of section 667, subdivision (a)(1). As to counts 3 and 4, the amended information also alleged defendant personally used a deadly weapon within the meaning of section 12022, subdivision (b)(1), during the incident on May 12, 2020.

Following trial on these charges, a jury convicted defendant on all counts, but found not true that defendant personally used a deadly weapon as to counts 3 and 4. In a bifurcated proceeding, the trial court found defendant suffered a prior conviction for violation of section 422, qualifying as a strike. The court also determined defendant suffered seven prior felony convictions for purposes of section 1203, subdivision (e)(4).[3]

---

[1] The record reflects that T.C.'s surname began with a "K." However, because the lower court and the parties refer to her as "T.C.," we do the same for the sake of consistency.

[2] All further references are to the Penal Code unless otherwise indicated.

[3] Based on the trial court's review of defendant's rap sheet, it could not determine whether the section 666 charge from 1992 was a felony or a misdemeanor, but all the other offenses appeared to the court to be felonies. The court found true beyond

Defendant was sentenced to an aggregate determinate term of 12 years 4 months.[4] The trial court imposed the upper term of three years on count 1 (§§ 422, 1170, subd. (h)(1)), doubled to six years for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)). On count 3, the trial court imposed eight months (one-third of the two-year middle term), doubled to 16 months for the prior strike (§ 667, subd. (e)(1)), to be served consecutive to count 1 (§ 1170.12, subd. (a)(6)). On count 4, the court imposed the upper term of three years (§§ 422, 1170, subd. (h)(1)), doubled to six years for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), to be served concurrent with count 1. The court also imposed an additional five years for the prior serious felony conviction enhancement (§ 667, subd. (a)). No time was imposed on the misdemeanor counts 2, 5, 6, and 7.[5]

Defendant argues there was insubstantial evidence to support his conviction on count 1 for making criminal threats against T.C. on May 8, 2020. Defendant also argues his request for a continuance due to an untimely probation report was denied, which caused the sentencing hearing to be fundamentally unfair, and resentencing is required. Finally, defendant argues Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567), which became effective on January 1, 2022, while this appeal was pending,

reasonable doubt the fact of all prior convictions, with the exception of the conviction under section 666 in Tulare Superior Court case No. 31514.

[4] The People correctly note the abstract of judgment incorrectly reflects a total term of 11 years 4 months. The abstract of judgment should reflect a total term of 12 years 4 months. Appellate courts have the inherent power to correct clerical errors in the abstract of judgment. (*People v. Jones* (2012) 54 Cal.4th 1, 89.) We order the trial court to issue an amended abstract of judgment correcting that error.

[5] The current offenses were committed while defendant was on mandatory supervision after pleading no contest to a violation of section 273.6, subdivision (d) and receiving a two-year split sentence under section 1170, subdivision (h). At the sentencing hearing, defendant's mandatory supervision was terminated, and he was ordered to serve concurrently the time remaining on his previously imposed two-year sentence.

applies retroactively. As the new law limits the trial court's discretion to impose an upper-term sentence, defendant maintains his upper-term sentences were imposed improperly under the new law, and remand for resentencing in compliance with Senate Bill No. 567 is required.

For the reasons discussed below, we affirm the judgment.

## BACKGROUND

T.C. testified defendant is her former boyfriend; they broke up about three years before trial. According to T.C., defendant was violent and abusive; she has been trying to stay away from him but he would not leave her or her family and friends alone. She has obtained restraining orders against him in the past, but he keeps making contact with her and her family.

Since her breakup with defendant, T.C. still "hang[s] out" with him. T.C. admitted she is a methamphetamine addict and that she had smoked the drug the night before her trial testimony. She often obtains the drug from defendant. Since their breakup, T.C. has tried not to smoke the methamphetamine defendant provides, but defendant uses it as a way to be with her and control her.

T.C. and her father live in separate trailers on her father's property. Defendant lived with T.C. for the first six months they were together, but T.C.'s father kicked defendant out one day while she was gone. Since then, T.C.'s father had not wanted defendant on the property at all. T.C. testified she made the mistake of helping defendant get onto the property without her father's knowledge in the past, before the restraining order against defendant was in place. On prior occasions, her father had shot at defendant with a BB gun when he caught defendant on the property.

On the evening of May 8, 2020, T.C. was in her trailer when her father called her to say there was a light in the trees. She thought her father was talking about the neighbors, not the orchard across from the property. When she walked outside, she heard defendant yelling. Defendant had done this type of thing before, threatening her and her

4.

father. He has also been in the orchard across from her father's property on prior occasions; the property is fenced, and defendant has jumped the fence in the past. On the evening of May 8, 2020, defendant was threatening her and her father. He was saying that she was "done for," meaning he was going to kill her if she was not with him. T.C. told her father to call 911 while she recorded defendant with her cell phone.

T.C.'s recording of defendant was given to responding Tulare County Sheriff's Department Deputy Sandoval, and it was played for the jury at trial. Sandoval testified he was dispatched to T.C.'s residence where he interviewed T.C. and T.C.'s father. He observed that T.C.'s father seemed more angry than scared, but T.C. appeared scared to Sandoval. Deputies conducted a search for defendant in the orchard, but could not find anyone. Sandoval recognized defendant's voice on T.C.'s recording as he had contacted defendant on prior occasions.

On May 12, 2020, T.C. went to J.S.'s residence. T.C. did not know J.S. well—they had met briefly one time when defendant was living at J.S.'s house. T.C. believed defendant had left J.S.'s house two weeks before when J.S. had kicked him out. T.C. had run into J.S. a few days before and asked J.S. if she could stop by to talk. On May 12, 2020, T.C. had just gone into J.S.'s house when defendant threw a board through a window and was beating on the front door. T.C. recognized defendant's voice when he began screaming and yelling for T.C. to come out of J.S.'s house. He was calling T.C. a whore and slut and was kicking in the door; T.C. never saw defendant with any kind of weapon during that time. T.C. was terrified because she knows what defendant is capable of doing, and she was scared for the other people in the house and that they would be injured because of her.

T.C. decided to go outside; she told defendant to calm down, to stop tearing up the house and she would come out. By the time T.C. decided to come out, defendant had already left and jumped the fence that surrounded J.S.'s residence. He was across the street screaming, yelling and threatening her life. The police arrived, T.C. pointed them

in defendant's direction, and defendant ran. While the police pursued defendant, T.C. went back to her own property. She waited for officers to contact her there.

J.S.[6] testified she and defendant were related through marriage. She also knew that he and T.C. had dated in the last five years. Defendant had lived at J.S.'s residence, but she had kicked him out three months prior to the May 12, 2020 incident, when she had caught him stealing tools out of her shop. J.S. had met T.C. two or three times before, including when defendant brought T.C. to J.S.'s house while defendant was living there—J.S. testified T.C. had visited defendant about a month before the incident.[7] J.S.'s house is fenced in with a locked gate. There are cameras outside, but they project only a live feed and do not record content.

On May 12, 2020, T.C. had arrived at J.S.'s house about 12:45 p.m. J.S. went outside and opened the gate so T.C. could pull her truck into the driveway. J.S. then locked the gate and she and T.C. went inside. Immediately thereafter, defendant started banging on the door. Defendant was yelling, screaming and hitting the door with things. J.S. later found a two-by-four had been thrown through her window. Defendant was also trying to kick in the door and damaged it while doing so. He kept saying he was going to "kill you, you stupid bitches."

J.S. called 911; she also walked to a different part of the house where she had a view of the porch where defendant was trying to get into the residence. J.S. saw him with a knife in his hand and it looked like he was hitting the door with it. When officers arrived, defendant fled the area. T.C. left, and J.S. locked and closed the gate behind T.C.'s vehicle. When Tulare County Sheriff's Department Deputy Williams arrived

---

[6] The record reflects that J.S. changed her surname to begin with "M." However, because the lower court and the parties refer to her as "J.S.," we do the same for the sake of consistency.

[7] J.S.'s testimony was inconsistent about when she asked defendant to move out of her property.

later, it was dark. J.S. had misplaced the keys to the gate and could not let Williams into the yard.

Williams testified that he was dispatched to J.S.'s residence on May 12, 2020, because of an altercation involving defendant, and he was aware of defendant's restraining orders from previous contacts with defendant. When he arrived, he saw J.S. and T.C. inside the secured fenced area at J.S.'s residence, and defendant was across the street in a driveway. When Williams exited his vehicle, defendant immediately fled. Deputies pursued defendant, and he was apprehended about 10 or 15 minutes later. Defendant was searched, and deputies found drug paraphernalia in his pocket, a condom, money, and a butane lighter. No knife was found.

Williams interviewed T.C. on May 12, 2020; T.C. said she had gone to J.S.'s house and, while she was there, she heard a loud banging sound on the door and someone was trying to break into the house. T.C. recognized defendant's voice, and defendant was saying that T.C. should come outside or he would kill her and harm occupants inside the house. T.C. thought it was in her best interest to go outside so no one else would get hurt. When T.C. went outside, law enforcement had started to arrive in the area. Williams thought T.C. looked extremely upset when she was interviewed and appeared fearful. She had difficulty speaking and she was shaking.

Williams also interviewed J.S. that day, and J.S. appeared angry, upset, and fearful. To Williams, J.S.'s property did not appear well kept—there were weeds and dry grass partially obscuring several vehicles parked on the property. He was unable to examine the property, however, because J.S. had misplaced her keys to the gate and could not let him onto the property. When Williams returned to J.S.'s property in October 2020 to examine damage to the front door, the property also appeared cluttered and unkempt.

Timothy Stewart testified on behalf of defendant. Stewart had known defendant for more than three years, and had known T.C. for about 13 or 14 years. J.S. lives across the street from Stewart, and Stewart had seen T.C. over at J.S.'s house to visit defendant

on prior occasions. J.S. had kicked defendant out about two days before the incident. Defendant was staying in a van in Stewart's driveway, where he had stayed for about two nights. On the day of the incident, Stewart had walked to the store—he did not see anyone outside the house before he left. When he walked back, he saw T.C. at J.S.'s house. T.C. was talking loudly and saying things to defendant, and defendant was responding. Stewart told defendant not to "mess" with T.C., and started walking back to Stewart's trailer. As soon as he and defendant started walking back to the trailer, deputies arrived.

A stipulation was read to the jury that on December 17, 2019, defendant was convicted of one misdemeanor count of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a); on May 14, 2019, defendant was convicted of two misdemeanor counts of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a); and on July 1, 2019, defendant was convicted of one misdemeanor count of violating a court order to prevent domestic violence in violation of section 273.6, subdivision (a).

On October 23, 2020, the jury returned a guilty verdict on all counts, but found not true the special allegation that defendant personally used a deadly or dangerous weapon as to counts 3 and 4. On January 15, 2021, defendant was sentenced to an aggregate term of 12 years 4 months. On counts 1 and 4, the trial court imposed the upper term.

On February 3, 2021, defendant filed a notice of appeal.

## DISCUSSION

### I. SUBSTANTIAL EVIDENCE SUPPORTS COUNT 1

Defendant argues there is insubstantial evidence to support his conviction for making criminal threats against T.C. on May 8, 2020, in violation of section 422 as alleged under count 1.

8.

## A.    Standard of Review

The relevant inquiry governing a challenge to the sufficiency of the evidence " 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055, italics omitted.) The reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

We "presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis . . . is there sufficient substantial evidence to support" ' the jury's verdict." (*Ibid*.)

"In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid*.) " ' " '[A]lthough an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of the statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a

9.

judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 209.)

### B. Additional Background: Recorded Statements on May 8, 2020

T.C. made a recording of a portion of the interaction with defendant on May 8, 2020, which was delivered to Sandoval when he was dispatched to the scene. That recording was played for the jury, and a transcript was provided.[8] In relevant part, the recording transcript provides as follows:

| | |
|---|---|
| "[Defendant]: | Kill me. I'm waiting for the cops. (Inaudible) [¶] . . . [¶] |
| "[Defendant]: | (Inaudible) shoot me. (Inaudible) shoot me. |
| "[T.C.]: | No nobody's gonna be doing anything. |
| "[Defendant]: | (Inaudible) cops. I'm right here. (Inaudible) shoot me—shoot me. (Inaudible) shooting at me. [¶] . . . [¶] |
| "[Defendant]: | Fuck you, [T.C.] Fuck you. (Inaudible) you're a low life (inaudible) fat whore. Yeah your—your time's—you[r] time's done—you[r] times done. |
| "[T.C.]: | So you're threatening my life again? |
| "[Defendant]: | (Inaudible) your times done—your time's done. (Inaudible) |
| "[T.C.]: | You're coming back? |
| "[Defendant]: | (Inaudible) |
| "[T.C.]: | You're gonna burn my house down and stuff alright—right? That's what you just said. |
| "[Defendant]: | (Inaudible) run. |

---

[8] The recording was not provided as part of the record on appeal, but the transcript the parties stipulated to provide to the jury is contained in the clerk's transcript.

10.

"[T.C.]:     Yeah run.  Run like you always do.

"[Defendant]:     (Inaudible) run.  I'm gonna go get me a gun.

"[T.C.]:     You're gonna go get a gun?

"[Defendant]:     At your house.  I'm gonna shoot at your house, bitch.

"[T.C.]:     You're gonna shoot at my house?

"[Defendant]:     Yeah, yeah I am.  You—you guys shot at me.

"[T.C.]:     Because you're over here on the fucken property and shit.

"[Defendant]:     I didn't (inaudible).

"[T.C.]:     You're fucken here fucken tormenting me.

"[Defendant]:     No I'm not.  Your dad is shooting at me.  (Inaudible)

"[T.C.]:     Because you're over here and you're not even supposed to be over here.  You need to leave me alone.  You've been tormenting me.  Throwing shit at me now?

"[Defendant]:     Shoot me—shoot me.  Bitch, shoot me—shoot me. [¶] . . . [¶]

"[Defendant]:     You're dead.

"[T.C.]:     Oh I'm dead?

"[Defendant]:     You're dead.

"[T.C.]:     Oh I'm dead?

"[Defendant]:     Yeah—yeah you shot at me.  Well hey I'll wait for the cops.  (Inaudible)—

"[T.C.]:     Good wait for 'em.  I'm waiting for 'em too.

"[Defendant]:     Hey no—no you shot at me.  (Inaudible).  [T.C.], you're a low life (inaudible).

"[T.C.]:     Oh I'm a lowlife?  I'm not the one that's tormenting you.  I'm not the one that's harassing you.

11.

"[Defendant]:     (Inaudible).  You're a low life cunt—you're a low life (inaudible).

"[T.C.]:          Well you know what?  I'm a low life cunt that's fine. Why don't you leave me the fuck alone?

"[Defendant]:     (Inaudible) low life.  (Inaudible)  [¶] . . . [¶]

"[Defendant]:     (Inaudible) you got.  Bitch, I'm (inaudible) everything you got.  I'll be back, bitch."

## C.     Analysis

To prove a violation of section 422 for making a criminal threat, the prosecution must establish (1) the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person"; (2) the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out"; (3) the threat, which may be "made verbally, in writing, or by means of an electronic communication device," was "on its face and under the circumstances in which it [was] made . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat"; (4) the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety"; and (5) the threatened person's fear was "reasonabl[e]" under the circumstances. (§ 422, subd. (a); *People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

### 1.     *Specific Intent Statement be Taken as a Threat*

As to count 1, defendant argues there is insufficient evidence, in light of the surrounding circumstances, to establish he intended for T.C. to perceive his words as a threat on the night of May 8, 2020.  The People dispute defendant is entitled to any relief on this claim.

To determine a defendant's intent that words be taken as a threat, a jury examines the words used and all the surrounding circumstances.  (*People v. Butler* (2000) 85 Cal.App.4th 745, 754.)  There is very little ambiguity that defendant threatened to kill

12.

T.C. multiple times in his statements to her on May 8, 2020. When T.C. questioned whether defendant was "threatening [her] life again," defendant responded by saying, "[Y]our time[']s done[. Y]our time's done." Defendant also told her he was going to get a gun, and that he was "gonna shoot at your house, bitch." He told T.C. twice that she was "dead." Before he left, he told T.C. he would "be back, bitch," and the added expletive emphasized the menacing nature of his promised return.

The parties' history is one of the relevant surrounding circumstances a jury may consider to determine intent. (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) Setting defendant's words in the context of his history with T.C., there was substantial evidence for the jury to determine the statements were meant to be taken as a threat. From T.C.'s testimony, the jury could infer defendant had long been using threats and intimidation to control T.C. T.C. testified that before the incident on May 8, 2020, she had obtained a restraining order against defendant because he had continued to threaten and abuse her.

Despite the restraining order, T.C. testified defendant would show up at her residence with regularity. On one occasion he hid underneath her trailer and when she came out, he forced her back into the trailer and refused to allow her to leave or visit her children. Defendant was constantly "shoving" methamphetamine at her, telling her to smoke it with him—he would not leave her alone. If she tried to obtain the drug from different sources, defendant would make it impossible. T.C. also testified defendant was violent and controlling. Sometimes, despite the restraining order, she would "give in" and "hang out" with defendant because that was easier than putting her father or anyone else through more stress. In this context, there was substantial evidence for the jury to infer defendant's conduct toward T.C. in their relationship was hostile, controlling, and physically abusive. The jury could reasonably evaluate defendant's threats on May 8, 2020, in the context of their relationship history and infer defendant intended that T.C. perceive his statements as threats so that she would comply with his wishes and not

13.

interfere with what he wanted—including showing up at her property in violation of a restraining order and harassing her.

Moreover, after threatening to shoot at her house, telling her he was going to get a gun and that she was dead, defendant told T.C. he would be back. Defendant argues his conduct in running away from T.C.'s property, as T.C. herself said on the recording he always does, demonstrates he did not specifically intend any of his statements to T.C. to be interpreted as threats. However, the jury could reasonably conclude defendant ran away because T.C. told him she had called the police. Further, four days later, there was evidence defendant tried to beat down the door of J.S.'s home while T.C. was there, threatening again to kill T.C. and everyone in the residence. (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 [the defendant's subsequent conduct is evidence a jury may consider to determine whether words were meant to be taken as a threat].)

There was ample evidence for the jury to reasonably infer T.C.'s relationship with defendant was hostile: T.C. testified he was violent and abusive, and she had obtained a restraining order that he had violated many times. The names defendant called her at the time he made his threats, the history of their relationship, and his subsequent conduct four days later beating in a door and threatening to kill T.C. again, and everyone in the residence, was substantial evidence the jury could reasonably rely on to conclude defendant intended for T.C. to perceive his words to her on May 8, 2020, as threats.

### 2. *Unequivocal, Unconditional, Immediate and Specific Nature of Threats*

Defendant argues there was insufficient evidence his statements on May 8, 2020, were " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat.' " (*People v. Toledo*, *supra*, 26 Cal.4th at p. 228.) Defendant notes his exchange with T.C. on the May 8, 2020 voice recording shows he was reacting to being shot at by T.C.'s father, and in this context his statements were emotional outbursts, not criminal threats.

14.

Moreover, defendant points out, he ultimately fled (consistent with his past conduct) rather than carry out any threats against T.C., and he argues T.C.'s responses reflected no sense of foreboding: she seemed to be taunting defendant.

While defendant's argument may be one way to interpret the evidence, it does not undercut the substantial evidence supporting an interpretation of the evidence favorable to the verdict. (*People v. Collins* (2021) 65 Cal.App.5th 333, 344 [substantial evidence standard requires resolving conflicting inferences in favor of the jury's verdict].) When considering all the relevant surrounding circumstances including the parties' relationship history, there was substantial evidence for the jury to conclude defendant's threats on May 8, 2020, were so unequivocal, unconditional, immediate and specific as to convey to T.C. a gravity of purpose and an immediate prospect of execution of the threat. (*People v. Mendoza*, *supra*, 59 Cal.App.4th at p. 1340.)

As noted above, T.C. testified that defendant had threatened and abused her in the past, and that he was generally abusive and violent. He would frequently come onto her father's property, hiding under her trailer; on one occasion, defendant hid under her trailer, forced her back into the trailer when she came out, and precluded her from leaving and seeing her children; and he would not leave her family or friends alone until he got T.C. "back around." T.C. testified that when she has been around defendant, it was only because he would not leave her alone and it was easier than putting her father through more stress. Both T.C. and her father had called 911 in the past because defendant had kept up his threats and harassing behavior, and T.C. had obtained multiple restraining orders prior to the May 8, 2020 incident, which defendant had repeatedly violated.

In light of this testimony, the jury could reasonably conclude defendant was abusive and violent toward T.C.; he did not abide by an existing restraining order; he knew where T.C. lived; he knew how to obtain access to the property; and he had ambushed her in her trailer in the past. From this evidence, the jury could reasonably conclude T.C. would have been aware that defendant's flight after making his threats

15.

against her on May 8, 2020, did not diminish the likelihood of his returning at any time to carry them out—perhaps when T.C. was more isolated, less prepared, and less forewarned. Indeed, there was evidence defendant tried to beat down J.S.'s door four days later trying to get to T.C., while threatening to kill her and J.S.—a fact the jury found true by virtue of the guilty verdicts the jury rendered on the other criminal threat counts. The history of their relationship and defendant's subsequent conduct was substantial evidence from which the jury could conclude defendant's threats on May 8, 2020, to kill T.C. sufficiently conveyed a gravity of purpose and an immediate prospect of execution. (See *People v. Garrett* (1994) 30 Cal.App.4th 962, 965, 967 [the defendant's threat to put bullet in wife's head conveyed gravity of purpose and immediate prospect of execution because of the defendant's past beatings, wife's knowledge he kept a gun, and wife's knowledge he had been convicted of voluntary manslaughter in the past].)

As for defendant's assertion that T.C. seemed to be taunting defendant during the recorded portion of the incident, T.C.'s comments reasonably could have been interpreted by the jury as T.C.'s efforts to ensure that defendant's statements were memorialized and made clear on the recording. She testified she made the recording because she was trying to prove what he was doing to her. The jury also could have reasonably viewed T.C.'s comments as her effort to establish through the recording just how extreme and ongoing defendant's threats were, especially if she stood up for herself and told him to go away. That approach perhaps carried a heightened risk to T.C., but it does not necessarily indicate T.C. was unafraid or that the threats lacked a gravity of purpose and an immediate prospect of execution.

Finally, defendant argues his statements were merely emotional outbursts exhibiting his usual intemperance. There was substantial evidence defendant was abusive and violent, refused to abide by a restraining order, and T.C. and her father had called 911 in the past due to defendant's harassment and behavior. Moreover, four days after

the May 8, 2020 incident, defendant again threatened to kill T.C. while trying to beat down J.S.'s door to get to T.C. It was reasonable for the jury to infer and conclude from this evidence, especially given the similarity of the threats four days later and evidence that defendant made forceful attempts to get into J.S.'s house, that defendant's threats on May 8, 2020, were not merely emotional outbursts or ranting, but statements meant as threats. (See *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221 ["[The d]efendant's activities after the threat give meaning to the words and imply that he meant serious business when he made the threat." (italics added)].)

In total, there was substantial evidence to support the jury's guilty verdict on count 1.

## II.  TRIAL COURT'S REFUSAL TO GRANT CONTINUANCE AT SENTENCING HEARING

Defendant argues his sentencing was fundamentally unfair because the trial court did not grant his request for a continuance based on an untimely probation report—defendant maintains his counsel did not receive the probation report until the day of sentencing.

### A.  Background

At the outset of the sentencing hearing, the trial court asked whether there was any legal cause why judgment should not be pronounced. Defense counsel indicated defendant had a motion pending before the court under *Romero*[9] and another under section 17 to reduce defendant's felony convictions to misdemeanors, but beyond a decision on those motions, counsel expressly maintained there was no legal cause that judgment could not be pronounced.

The court then explained its reasons for denying defendant's *Romero* motion and refusing to sentence the felony convictions as misdemeanors under section 17. After the court's rulings, defense counsel inquired whether the court was going to adopt

---

[9] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

probation's recommendation as to the sentence. When the court indicated its plan to do so, the following exchange occurred:

> "[DEFENSE COUNSEL]: I would ask in that case to give defense an opportunity to submit a motion requesting less time for a mitigation [*sic*] sentencing.

> "THE COURT: I'm gonna proceed with the sentencing now. We've already continued it. You've submitted a number of arguments and papers on his behalf.

> "[DEFENSE COUNSEL]: In response to that, we continued it last time because we also didn't have a probation report in time. Defense and prosecution just received the probation report this morning.

> "THE COURT: If you want more time to address the factors in aggravation and mitigation, I'll hear from you further, but I'm not inclined to continue it out to file anything else. This report was filed on the 8th— [¶] . . . [¶]

> "[DEFENSE COUNSEL]: That might be. It was not in eCourts, and I understand that that's not the way—it was only uploaded to eCourts after the fact of sentencing.

> "So in that case, I think that some of the mitigating factors to this crime are the fact that . . . ."

## B.     Analysis

The parties dispute the basis for the requested continuance and whether the court's denial resulted in prejudicial fundamental unfairness in the sentencing. The People maintain the request to continue the sentencing was not predicated on an untimely provided probation report, it was to allow defense counsel time to file a statement in mitigation. The People assert the trial court did not abuse its discretion to deny that request because a statement in mitigation is due four days before the sentencing hearing, and it is not dependent on receipt of the probation report—especially since the probation report was not required to be available until two days before the sentencing hearing. Any

18.

request to continue based on an untimely probation report was not made and, thus, any error asserted on this basis was not preserved for appeal.

Defendant argues the colloquy between the court and defense counsel reflects the motion to continue was definitively based on the untimely receipt of the probation report, and the inability to prepare for sentencing rendered the hearing fundamentally unfair. Moreover, the statement in mitigation would surely have addressed any aggravating or mitigating factors identified in the probation report. Regardless that the probation report was not mandatorily provided under section 1203, the court's failure to allow a continuance for further preparation around the probation report rendered the sentencing fundamentally unfair.

Continuances in criminal cases may be granted only for good cause. (§ 1050, subd. (e).) The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion. (*People v. Beames* (2007) 40 Cal.4th 907, 920.) "Under this state law standard, discretion is abused only when the court exceeds the bounds of reason, all circumstances being considered." (*Ibid.*) "A reviewing court considers the circumstances of each case and the reasons presented for the request to determine whether a trial court's denial of a continuance was so arbitrary as to deny due process." (*People v. Doolin* (2009) 45 Cal.4th 390, 450.) A trial court may not exercise its discretion over continuances in a manner that deprives defendants or their attorneys a reasonable opportunity to prepare. (*Ibid.*; see *People v. Snow* (2003) 30 Cal.4th 43, 70.) "Although a defendant is not entitled to the same procedural safeguards at a sentencing hearing as he is at trial, the procedures must be fundamentally fair." (*People v. Leffel* (1987) 196 Cal.App.3d 1310, 1318 (*Leffel*), overruled on another ground in *People v. Bullock* (1994) 26 Cal.App.4th 985, 987–989.)

Not every denial of a request for a continuance constitutes a due process violation, "even if the party seeking the continuance thereby fails to offer evidence." (*People v. Beames*, *supra*, 40 Cal.4th at p. 921.) "Although 'a myopic insistence upon

expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality[,] . . . [t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process.' [Citation.] Instead, '[t]he answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " (*Ibid*.) "Absent a showing of an abuse of discretion and prejudice, the trial court's denial does not warrant reversal." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 450.)

When, as here, the court has requested a probation report pursuant to section 1203.10, a copy of that report must be "made available" to the court, the prosecution, and the defendant or his or her attorney, at least two days prior to the time for the sentencing hearing. (§ 1203d.)[10] Here, the record does not affirmatively establish when the probation report was "made available" to counsel. The probation report is stamped "RECEIVED" by the superior court on January 8, 2021, seven days before the January 15, 2021 sentencing hearing. When defense counsel noted she had not received the probation report until the morning of sentencing, the trial court pointed out the report had been received the week prior to the sentencing. Counsel asserted the report was not located in eCourts, but then appeared to concede that it would not appear in that software until the fact of sentencing hearing in any event. There was no further discussion between the court and counsel whether the probation report, despite that counsel had not received it until the day of sentencing, was nonetheless *available* to counsel at or near the time it was received by the court.

---

**10** As defendant was ineligible for probation given his prior strike conviction (§ 667, subd. (c)(2)), the probation report was not prepared pursuant to section 1203, subdivision (b)(1), which provides that if a person is convicted of a felony and is eligible for probation, the court shall immediately refer the matter to a probation officer to investigate and prepare a report.

20.

This is distinguishable from the facts in *Leffel*. There, defense counsel requested a continuance of the sentencing hearing on the ground he had not received the probation report required pursuant to section 1203 until the day prior to sentencing; while counsel had checked with the court clerk's office at 11:00 a.m. two days prior to sentencing, the report was not yet available at that time. (*Leffel*, *supra*, 196 Cal.App.3d at pp. 1314-1315.) The record in that case made clear the report was untimely because not only was counsel not in actual receipt of it until the day before the hearing, it was not *available* to counsel at the clerk's office in the required statutory time period. In the instant case, the record does not clearly establish the probation report was unavailable to counsel two days prior to the sentencing hearing as required under section 1203d.

Nevertheless, even assuming the probation report was not made available to counsel until the day of sentencing, under the circumstances presented here we are unable to conclude the trial court abused its discretion in denying the motion for a continuance. At the outset of the hearing, the trial court asked whether there was any legal cause not to proceed with sentencing, and defense counsel affirmatively represented there was no legal cause *not* to proceed. Later in the hearing, after defendant's *Romero* and section 17 motions were denied, defense counsel requested a continuance to file "a motion requesting less time for a mitigation sentencing." As the People note, a statement in mitigation was to be filed "[a]t least four days prior to the time set for imposition of judgment." (§ 1170, subd. (b)(4).) The ability to file a statement in mitigation is not dependent on receipt of the probation report which, in this case, was not required to be filed until two days before the sentencing hearing. (§§ 1170, subd. (b)(4), 1203d.) As counsel did not articulate why that statement could not have been timely filed, especially since defendant filed motions prior to sentencing under *Romero* and section 17, we cannot find the trial court abused its discretion in denying the motion on that ground.

Even to the extent defense counsel was seeking more time to review the probation report to address the aggravating factors noted therein, the court specifically told counsel

it would hear from her further on her request for a continuance if she needed more time to address factors in mitigation and aggravation. Defense counsel did not respond to that invitation, and instead began to address factors in mitigation and aggravation. In sum, there is no affirmative evidence the probation report was not available to counsel in the time required under section 1203d; counsel did not raise any concerns about an untimely probation report at the outset of the hearing; counsel did not respond to the court's invitation to explain whether the continuance later sought was needed to adequately address aggravating circumstances articulated in the probation report; and counsel never indicated she was not prepared to go forward with the sentencing hearing without further review of the probation report. On this record, we are unable to conclude the probation report was unavailable to counsel at least two days prior to the sentencing hearing as required under section 1203d, or that the court's denial of the motion to continue the sentencing hearing under these circumstances rendered the sentencing fundamentally unfair.[11]

## III.    Senate Bill No. 567

From March 30, 2007, through December 31, 2021, California's determinate sentencing law specified that "[w]hen a judgment of imprisonment [wa]s to be imposed and the statute specifie[d] three possible terms, the choice of the appropriate term . . . rest[ed] within the sound discretion of the court." (§ 1170, former subd. (b).) In January

---

[11] The People maintain there can be no fundamental unfairness caused by a court refusing to continue a sentencing hearing based on an untimely probation report if the probation report was not mandatory but merely discretionarily requested by the court. However, if the sentencing court relies on a probation report in formulating the judgment—whether or not the probation report was mandatory or discretionarily requested by the court—and that probation report was not made available to counsel timely as required under state law, such an error could cause a sentencing hearing to be fundamentally unfair if a request to continue on that basis was made and prejudicially rejected. (See *People v. Doolin*, *supra*, 45 Cal.4th at p. 450 [trial court may not exercise its discretion over continuances in a manner that deprives defendants or their attorneys a reasonable opportunity to prepare].)

2021, applying the law as it existed, the trial court found true at least five aggravating circumstances and no circumstances in mitigation, and imposed the upper term on counts 1 and 4.

Effective January 1, 2022, Senate Bill No. 567 amended section 1170, subdivision (b). (Stats. 2021, ch. 731, § 1.3.) Section 1170, subdivision (b)(2) now provides, "[t]he court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." As an exception to the general rule, the court may consider the fact of the defendant's prior convictions based on a certified record of conviction without it having been stipulated to by the defendant or found true beyond a reasonable doubt at trial by a jury or the judge in a court trial. (§ 1170, subd. (b)(3).)

As a threshold matter, the parties agree, as do we, that Senate Bill No. 567 applies retroactively to defendant's case pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (see *People v. Dunn* (2022) 81 Cal.App.5th 394, 402–403 (*Dunn*); *People v. Flores* (2022) 73 Cal.App.5th 1032, 1038–1039). However, the parties disagree regarding whether resentencing under section 1170, subdivision (b) is required. Specifically, defendant contends that we must vacate his sentence and remand the matter because he did not admit, the jury did not find true beyond a reasonable doubt, and the court did not find true beyond a reasonable doubt in a court trial the facts underlying the circumstances in aggravation that the trial court relied upon in imposing the upper term; nor did the trial court find defendant had suffered numerous or increasingly serious prior convictions as proved by certified records of conviction.

On the other hand, the People argue that any error was harmless because at least two aggravating circumstances were proved as required by section 1170, subdivision (b).

For the proposition that any error was harmless if at least one but fewer than all aggravating circumstances were proved in compliance with section 1170, subdivision (b), the People rely upon *People v. Flores* (2022) 75 Cal.App.5th 495, which applied the harmless-beyond-a-reasonable-doubt standard of harmless error from *Chapman v. California* (1967) 386 U.S. 18 as adapted to the context of violations of the Sixth Amendment right to a jury trial on aggravating circumstances by *People v. Sandoval* (2007) 41 Cal.4th 825, 838–839.

We conclude the trial court's imposition of the upper term did not meet the requirements of section 1170, subdivision (b), but the error was harmless based on the standard this court articulated in *Dunn*, *supra*, 81 Cal.App.5th at pages 409–410.[12]

A.    Background

The first amended information alleged that defendant had suffered eight prior felony convictions, including one prior conviction which qualified as a prior strike conviction and a prior serious felony conviction. Specifically, it alleged he was convicted of a 1992 conviction for petty theft with prior convictions for the same (§ 666); a 1995 conviction for evading a peace officer in a vehicle with willful or wanton disregard for the safety of person or property (Veh. Code, § 2800.2); two 1997 convictions for battery of emergency personnel causing injury (§ 243, subd. (c)); a 1997 conviction for exhibiting a deadly weapon to resist arrest (§ 417.8); a 2002 conviction for grand theft (§ 487, subd. (a)); a 2010 strike conviction for making criminal threats (§ 422); and a 2019 conviction for violation of a protective order (§ 273.6, subd. (a)).

---

[12] Throughout our discussion, we refer to section 1170, subdivision (b) "error." However, we note that at the time the trial court sentenced defendant, it correctly applied the then-existing law. Accordingly, while we refer to section 1170, subdivision (b) "error," we are mindful that the trial court complied with the applicable law at the time of sentencing.

On October 23, 2020, at a bifurcated proceeding outside the presence of the jury, the trial court determined the truth of the seven prior felony conviction allegations. Admitted into evidence for that purpose were (1) a certified rap sheet of defendant's criminal record[13] and (2) a certified record of conviction from the Tulare County Superior Court case regarding defendant's 2010 strike conviction for making criminal threats. The trial court further took judicial notice of its own records in a Tulare County Superior Court case regarding defendant's 2019 conviction for violation of a protective order. The court found as follows:

> "The Court finds that it has been proven beyond a reasonable doubt that the defendant . . . has suffered a conviction for a felony violation of Penal Code Section 422 in Case [No.] [V]CF229191 . . . . Based on my review of the RAP sheet, I could not determine whether the [section] 666 charge from 1992 was a felony or a misdemeanor, but all the other alleged offenses under [section] 1203 appear to be felonies. . . . I've taken judicial notice of the file in Case [No.] 385431 and find that [defendant] suffered a conviction for the felony violation of Penal Code Section 273.6[, subdivision ](a) . . . .
>
> "So in short, all the special allegations regarding prior convictions[,] with the caveat that the [court could not determine whether the section] 666 allegation in Case 31514[] [is a misdemeanor or felony,]. . . are found true beyond a reasonable doubt."

At the sentencing hearing, on January 15, 2021, defendant's counsel argued that mitigating circumstances existed that weighed against imposing the upper term and addressed the aggravating circumstances identified in the probation officer's report:

> "[T.C.] has admitted on the stand that she often does invite [defendant] over; that they do have a on-again, off-again relationship.

---

[13] For each offense of conviction, the rap sheet identified the sentence and, if applicable, defendant's grants of probation, jail sentences and reinstatements of probation after violations of probation, and violations of parole.

"As to the facts relating to [defendant], he admits to probation that he has a history of alcohol and substance abuse and does wish to engage in some sort of rehabilitation program as far as that goes.

"Aggravating factors; I understand that the probation report indicates that some of the aggravating factors are some of the very same things that this court has mentioned regarding the adult – the numerous adult convictions. [¶] Defense goes back to the fact that no serious or violent felonies have occurred since the 2010 strike."

After defendant's argument, the trial court addressed the two purported mitigating factors relied upon by defendant, and found true at least five aggravating circumstances and no mitigating circumstances, as recommended by the probation officer's report:

"I think in many circumstances the factors that [defense counsel] has pointed out would, indeed, weigh in mitigation in my view, specifically a drug problem can certainly mitigate a situation in certain circumstances, and I am mindful that relationships are complicated and that it's not always simply a one-way street.

"In this case, under these circumstances, I just can't give significant weight in mitigation to those factors based on the length of the history with [defendant] here.

"The drug issue has clearly been going on for quite some time. I see a drug conviction as early as 1995, and there are plenty of people with drug abuse problems that while they can struggle mightily with using controlled substances and their lives can get out of control in many ways, they don't go on to repeatedly harm other individuals, and unfortunately, that's just what I see here with [defendant].

"As to the involvement that [T.C.] had in making contact with [defendant], I don't have any doubt that there was some of that going on here, but [defendant] had been through the court system so many times with violations, and it was – or should have been so clear to him that no matter what [T.C]'s behavior was, he was not allowed to have any contact with her for very good reason; that – I don't weigh that in mitigation, either.

"I adopt the findings of aggravation – in aggravation listed by probation.

26.

"[1] [Defendant] was convicted of other crimes for which consecutive sentences could have been imposed but for which a concurrent sentence will be imposed.

"[2] I find that he has engaged in violent conduct which indicates a serious danger to society. There are many times when criminal threats cases are obviously just words, and so I am always aware of taking a close look – the importance of taking a close look to see whether there are good reasons to take someone's word seriously, and [defendant] has not just made threats in these cases and previously, but he has acted out conduct that gives me reason to believe that there is a reason to believe him when he says he might do things like this. [¶] So I find that he does pose a danger, his age notwithstanding.

"[3] His prior convictions are numerous.

"[4] He was on mandatory supervision and summary probation when the current offenses were committed.

"[5] His prior performance on probation, parole and mandatory supervision have all been unsatisfactory."

Beyond the aggravating circumstances identified by the probation officer, and before pronouncing the sentence, the trial court further commented: "[6] There are crimes of violence on more than one occasion; threats of violence on more than one occasion in this case."[14]

On that record, the trial court concluded that "the factors in aggravation here decidedly outweigh any factors in mitigation." It then imposed the upper term on

_____

[14] That defendant has committed multiple crimes of violence is not an aggravating circumstance specifically identified by California Rules of Court, rule 4.421 (further references to a rule or rules refer to the California Rules of Court). The trial court's comment may have simply been a further justification for its second aggravating circumstance finding, it may have been an explanation of the first aggravating circumstance finding (see rule 4.425(a)(2) [whether "crimes involved two separate acts of violence or threats of violence" impacts a trial court's sentencing choice for concurrent versus consecutive sentencing]), or it may have been a separate circumstance that the trial court believed "reasonably relate[d]" to the "circumstances under which the crime was committed" such that it was appropriately considered under rule 4.421(c). Because it is not clear to us, in an abundance of caution, we treat the trial court's statement as an articulation of a sixth aggravating circumstance.

27.

counts 1 and 4, setting the term on count 4 to run concurrent with the term on count 1, and imposed a consecutive one-third middle term on count 3.

## B. Compliance With Section 1170, Subdivision (b), as Modified by Senate Bill No. 567

Our first consideration is whether the aggravating circumstances relied upon by the trial court were proved in compliance with section 1170, subdivision (b)(2) or (b)(3).

As to the first aggravating circumstance—that defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which a concurrent sentence will be imposed (rule 4.421(a)(7))—the sentence on count 4 was designated to run concurrently to the sentence imposed on count 1, so we first review the operative information and the jury's verdicts. Count 1 alleged that defendant committed the crime of criminal threats, naming T.C. as the victim, on or about May 8, 2020; count 4 alleged that defendant committed the same offense, naming J.S. as the victim, on or about May 12, 2020. The verdict forms reflect the separate victims for counts 1 and 4, and refer to the specific counts of the information.

Section 669, subdivision (a) directs that "[w]hen a person is convicted of two or more crimes . . . the second or other subsequent judgment upon which sentence is ordered to be executed shall direct whether the terms of imprisonment or any of them to which he or she is sentenced shall run concurrently or consecutively." (See § 1170.1, subd. (a).) Section 669 "grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes." (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.) Rule 4.425 sets out the considerations for making the discretionary choice between concurrent and consecutive sentencing, including whether "(1) [t]he crimes and their objectives were predominantly independent of each other"; "(2) [t]he crimes involved separate acts of violence or threats of violence"; and "(3) [t]he crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." The jury's verdict

28.

necessarily decided beyond a reasonable doubt that counts 1 and 4 involved separate threats of violence and were committed at different times. Based on those factual predicates, the trial court had the discretion to impose the sentence on count 4 consecutive to the sentence on count 1 but elected not to do so. The first aggravating circumstance was proved in compliance with section 1170, subdivision (b)(2).

As to the second aggravating circumstance, while defendant had certainly engaged in violent conduct as evidenced by the fact of his present and prior violent convictions, whether his conduct "indicate[d] a serious danger to society" (rule 4.421(b)(1)) was not a fact found true by the jury beyond a reasonable doubt or admitted by defendant. That circumstance was not proved in compliance with section 1170, subdivision (b).

As to the third aggravating circumstance, based on certified records of defendant's prior convictions (including the rap sheet), the trial court found true six prior felony convictions that supported its finding that defendant had suffered numerous prior convictions (the trial court did not find true defendant's 1992 petty theft with priors conviction); the trial court imposed a prior strike conviction modification to counts 1 and 4 and was not permitted to consider that conviction in imposing the upper term (rule 4.420(g); § 1170, subd. (b)(5)). (*People v. Searle* (1989) 213 Cal.App.3d 1091, 1098 [three prior convictions are numerous].) The third circumstance in aggravation was proved in compliance with section 1170, subdivision (b)(3).

As to the fourth aggravating circumstance, the jury did not find, and defendant did not admit, that he was on mandatory supervision and summary probation at the time of the offenses. While defendant's rap sheet tends to prove that defendant was on probation and mandatory supervision on the date he committed the charged offenses, section 1170, subdivision (b)(3) does not provide for the trial court to consider as an aggravating circumstance a defendant's probation or mandatory supervision status at the time of the charged offense without submitting the matter to a jury.

As to the fifth aggravating circumstance, defendant did not admit, and the jury did not find, that defendant's performance on probation, parole, and mandatory supervision had been unsatisfactory. Again, while defendant's rap sheet tended to prove that he suffered numerous violations of parole, those parole violations were not prior convictions appropriately considered pursuant to section 1170, subdivision (b)(3) without submission to a jury.

Finally, as to the sixth aggravating circumstance, insofar as the trial court intended its final comment before imposing defendant's sentence as a further aggravating circumstance, defendant's certified rap sheet demonstrated he had previously suffered multiple prior violent convictions[15] and the jury's verdicts necessarily concluded that defendant made at least three threats of violence in the present case. That aggravating circumstance was appropriately considered pursuant to section 1170, subdivision (b)(3).

In short, the first, third, and sixth aggravating circumstances were proved in compliance with section 1170, subdivision (b), but the second, fourth, and fifth circumstances were not. Unless the error was harmless, we must remand the matter to the trial court for resentencing.

## C. Harmless Error

### 1. Appropriate Standard

This court recently articulated the standard for harmless error in the Senate Bill No. 567 context. (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410.) We apply that standard:

> "The reviewing court determines (1)(a) beyond a reasonable doubt whether
> the jury would have found one aggravating circumstance true beyond a

---

[15] In addition to the prior felony convictions explicitly found true by the court in addressing the prior felony conviction allegations of the first amended information (§ 1203, subd. (e)(4)), which included battery to emergency personnel causing injury in 1997 (§ 243, subd. (c)), the rap sheet further reflected that defendant had been convicted of a misdemeanor assault offense in 1995 (§ 245, subd. (a)(1)), and misdemeanor infliction of corporal injury on an intimate partner in 2010 (§ 273.5, subd. (a)).

30.

reasonable doubt[16] and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410.)

Our dissenting colleague disagrees with this analysis. In our view, the disagreement centers in large part on whether Senate Bill No. 567 modified the standard for a trial court's exercise of discretion in selecting the lower, middle, and upper terms. Because our dissenting colleague concludes that Senate Bill No. 567 modified the standard for exercise of discretion, rather than the manner in which aggravating circumstances must be proved, she concludes that the "clear indication" standard of *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) is more applicable to the second part of the *Dunn* analysis than the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, which we apply. We respectfully disagree.

The clear indication standard asks whether there is a clear indication that the trial court would have imposed the same sentence absent the error. That standard ordinarily applies if the trial court did not understand its own discretion (*Gutierrez*, *supra*, 58 Cal.4th at p. 1391 [when sentencing court is unaware of the scope of its discretionary powers, "the appropriate remedy is to remand for resentencing unless the record 'clearly

---

**16** "Alternatively, this step is satisfied if the trial court relied upon an aggravating circumstance that relied only upon the fact of defendant's prior convictions and a certified record of defendant's convictions was admitted, or defendant admitted the facts underlying an aggravating circumstance. [¶] . . . [S]tep (1)(a) or one of its two alternatives must be satisfied to avoid offending the Sixth Amendment . . . . If not, the error is not harmless; the sentence must be vacated and the matter remanded to the trial court for resentencing consistent with section 1170, subdivision (b)."

indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion' "]) or if there is a retroactive change in the standard for exercise of discretion after the trial court's decision (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110–1111).  (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426.)  On the other hand, the reasonable probability test of *Watson* applies where the trial court understood the nature of its discretion but erred, for instance, in "relying on an improper sentencing factor . . . ." (*McDaniels*, *supra*, 22 Cal.App.5th at p. 426.)  The *McDaniels* court explained the dichotomy:

> "When a trial court has abused its discretion in choosing among available sentencing options, such as by relying on an improper sentencing factor, a reviewing court must still affirm unless 'the error complained of has resulted in a miscarriage of justice.'  (Cal. Const., art. VI, § 13.)  In these situations, the trial court has revealed which sentencing choice it prefers, and the reviewing court must decide whether there is a reasonable probability that the trial court's lawful exercise of discretion on remand will lead it to make a different choice.  But when . . . a trial court has made no discretionary choice because it was unaware it had authority to make one, an application of the 'reasonable probability' standard requires the reviewing court to decide what choice the trial court is likely to make in the first instance, not whether the court is likely to repeat a choice it already made.  While it is true that determining whether a trial court is likely to repeat a choice involves some degree of conjecture, determining what choice the trial court is likely to make in first instance is far more speculative, unless the record reveals a clear indication of how the court would have exercised its discretion." (*McDaniels*, *supra*, 22 Cal.App.5th at p. 426.)

A clear indication of how the trial court would exercise its discretion is necessary to find harmless error when the trial court did not understand its discretion or the nature of the discretionary choice has changed since the trial court's exercise of discretion. However, if the trial court has exercised its discretion, but merely relied on erroneous considerations, the reviewing court asks whether there is a reasonable probability the sentence would have been more favorable to defendant if the trial court had not relied on the erroneous considerations.

32.

Under section 1170, former subdivision (b) the choice of the lower, middle, or upper term rested "within the sound discretion of the court." A court was required to state the reasons for its sentence choice on the record at the time of sentencing. (§ 1170, former subd. (c).) That sentencing choice was reviewed for abuse of discretion. Presently, section 1170, subdivision (b) requires the trial court to impose a sentence no greater than the middle term unless the aggravating circumstances justify a higher sentence and the facts underlying those circumstances are proved as discussed above. (§ 1170, subd. (b)(1).) In that situation, the trial court may exercise its discretion to impose any of the three available sentences. (§ 1170, subd. (b)(1), (b)(2); rule 4.420(a), (b).) The factors in aggravation and in mitigation remain the same (rule 4.421); and the standard for reviewing whether the trial court abused its discretion in imposing the upper term remains the same. A trial court's exercise of discretion in selecting the upper, middle, or lower term remains the same. What is changed is the finder of fact for the facts underlying the aggravating circumstances. No presumption against the upper term exists when there are circumstances in aggravation that justify imposition of the upper term. (See Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 567 (2021–2022 Reg. Sess.) as amended Sept. 3, 2021, p. 4 [Sen. Bill No. 567 "creates a presumption of sentencing judg[]ment not to exceed the middle terms, unless there are circumstances in aggravation of a crime that justify the imposition of the upper term"].) In other words, the trial court's discretion to impose the upper term is limited only until the facts underlying aggravating circumstances that justify imposition of the upper term are proved as required.

The first step of the analysis from *Dunn* considers whether the facts underlying the aggravating circumstances relied upon by the trial court were provable. (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410.) If the facts underlying all circumstances were provable to the respective standards, the error is harmless because the trial court has already exercised its discretion—pursuant to the same discretionary standard as existed before

Senate Bill No. 567 took effect—to conclude that imposition of the upper term is warranted. (*Dunn*, at pp. 409–410.) If not, we consider whether there is a reasonable probability the trial court would have exercised its discretion differently without consideration of unproved factors. (*Id.* at p. 410; see *McDaniel*, *supra*, 22 Cal.App.5th at p. 426.)

In sum, while the manner of establishing the factual predicates underlying the aggravating circumstances relied upon by the trial court has changed, the exercise of discretion has not. Senate Bill No. 567 did not change the nature of, or considerations involved in, the trial court's exercise of discretion in selecting between the lower, middle, or upper term. For that reason, we conclude that *Watson*'s "reasonable probability" test applies rather than *Gutierrez*'s "clear indication" test.

### 2. Analysis

Returning to the aggravating circumstances relied upon by the trial court, we consider whether the second, fourth, and fifth circumstances—although not proved in compliance with section 1170, subdivision (b)—would have been found true by the jury beyond a reasonable doubt. Because we concluded that the first, third, and sixth aggravating circumstances were proved in compliance with section 1170, subdivision (b)(2) and (b)(3), we need only conclude that there is no reasonable probability that the jury would not have found true beyond a reasonable doubt each remaining aggravating circumstance. (*Dunn*, *supra*, 81 Cal.App.5th at p. 409, fn. 13.)

As to the second aggravating circumstance, while there can be no dispute that defendant had previously been convicted of violent offenses and in this case threatened to kill T.C. while attempting to beat down the door to J.S.'s home, there is a reasonable probability that the jury would not have found true that defendant's prior violent conduct presently "indicate[d] a *serious* danger to society." (Rule 4.421(b)(1), italics added.) Our Supreme Court has cautioned against attempting to determine whether a jury would have found true aggravating circumstances that require "an imprecise quantitative or

34.

comparative evaluation of the facts." (*People v. Sandoval, supra*, 41 Cal.4th at p. 840.) "[T]o the extent a potential aggravating circumstance . . . rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Ibid*.) Such is the case here. Whether defendant posed a serious danger to society is a somewhat subjective inquiry, not capable of precise determination. For instance, the jury might have concluded that because defendant was not armed with a weapon during the commission of the offenses, he did not pose a *serious danger* to society. Or it could have determined that he posed a serious risk of danger to society because of his repeated interactions with T.C. despite the protective order precluding him from such contact. Any conclusion on our part would be speculative.

As to the fourth circumstance in aggravation, the certified rap sheet shows that defendant was granted a three-year term of probation on July 1, 2019, in Tulare County Superior Court case No. PCM382096 based on his conviction for violation of a protective order. The rap sheet further reflects that on December 17, 2019, defendant was sentenced in Tulare County Superior Court case No. PCF385431 to a two-year split sentence, with one year to be served in county jail and the other on mandatory supervision, for violation of a protective order. Indeed, defendant stipulated that he committed both offenses. On May 8, 2020, and on May 12, 2020, defendant committed the offenses now before this court. There is no reasonable probability that a jury would have concluded beyond a reasonable doubt that defendant was not on mandatory supervision and probation on the dates he committed the offenses in this case.

As to the fifth circumstance in aggravation, defendant's rap sheet showed that he was found in violation of parole nine times: on October 20, 2000, October 3, 2001, June 27, 2002, April 8, 2005, July 22, 2005, January 20, 2006, September 18, 2006, July 9, 2007, and September 10, 2008. The rap sheet further shows defendant violated

probation at least seven times and mandatory supervision once: defendant was granted three years' probation on October 12, 2000, and began serving a sentence for a new offense of conviction on August 25, 2001. Defendant was granted three years' probation on March 6, 2009, and began serving a new term of probation for a new offense of conviction on July 7, 2009. Defendant was again granted three years' probation on July 7, 2009, and began serving a sentence for a new offense of conviction on March 4, 2010. Defendant was granted 60 months' probation on August 17, 2018, and was convicted of new offenses on October 18, 2018. Defendant was granted three years' probation on the new offense on October 18, 2018, and was convicted of new offenses on May 14, 2019, for which he was granted an additional three-year term of probation. On July 1, 2019, defendant was convicted of a new offense and granted an additional three-year term of probation. On December 17, 2019, defendant was convicted of a new offense and granted a split sentence, with one year to be served in jail and one year of mandatory supervision. On May 8, 2020, and May 12, 2020, defendant committed the instant offenses. In short, in the past 20 years, defendant has not successfully completed parole, probation, or mandatory supervision. The probation report, upon which the trial court relied, reflected the same violations of probation, parole, and mandatory supervision. Defendant did not object to the accuracy of the rap sheet or the probation report at sentencing and there was no logical reason that he would not have done so if any portion of those documents was not correct. We have no difficulty concluding that there is no reasonable probability the jury would not have concluded beyond a reasonable doubt that defendant's performance on parole, probation, and mandatory supervision was unsatisfactory.

To recap, the first, third, and sixth aggravating circumstances were proved in compliance with section 1170, subdivision (b); and we conclude there is no reasonable probability the fourth and fifth circumstances would not have been found true by the jury beyond a reasonable doubt; however, we conclude there is a reasonable probability the

36.

jury would not have found true beyond a reasonable doubt the second aggravating circumstance. We must therefore determine whether there is a reasonable probability the trial court would have sentenced defendant to a sentence less than the upper term based on the first, and third through sixth aggravating circumstances. We conclude there is not. In considering all six aggravating circumstances and no circumstances in mitigation, the trial court commented that "the factors in aggravation here decidedly outweigh any factors in mitigation." Even without consideration of the second circumstance in aggravation, there is no reasonable probability the trial court would have imposed a lesser sentence. This is particularly true in light of the overlap between the second and sixth factors in aggravation. While a jury may not have found true that defendant posed a serious danger to society, the trial court was permitted to rely on the violent nature of defendant's prior offenses and the threats of violence found true by the jury beyond a reasonable doubt in this case in considering whether the upper term was warranted. In our view, those factors considerably overlap. Because five of the six aggravating factors relied upon by the trial court in imposing the upper term were proved in compliance with section 1170, subdivision (b) or provable on the record before us to the jury beyond a reasonable doubt, because the one aggravating circumstance not provable from the record considerably overlapped with an aggravating circumstance proved in compliance with section 1170, subdivision (b)(3), and because the trial court gave no weight to the alleged circumstances in mitigation, we conclude there is no reasonable probability the trial court would have imposed a term less than the upper term if it had not erroneously considered the second aggravating circumstance. We therefore find the error harmless.[17]

---

[17] Defendant notes the court did not address the section 667, subdivision (a), prior serious felony enhancement as to counts 3 and 4, and that the abstract of judgment should be corrected to reflect the enhancements were stayed as to those counts. In the context of determinate term sentences, prior serious felony enhancements do not attach to particular counts, but are instead added just once at the final step in computing the aggregate

## **DISPOSITION**

The trial court is directed to issue an amended abstract of judgment reflecting defendant's total term of imprisonment is 12 years 4 months.  In all other respects, the judgment is affirmed.

DETJEN, J.

I CONCUR:


HILL, P. J.

---

determinate sentence.  (*People v. Sasser* (2015) 61 Cal.4th 1, 15–17.)  Here, the court correctly imposed the enhancement once, as the abstract of judgment accurately reflects.

MEEHAN, J., Concurring and Dissenting.

## I.    Introduction and Summary

I concur in the majority's affirmance of defendant's conviction on count 1 in part I. of the Discussion, and in affirmance of the trial court's denial of a continuance of the sentencing hearing in part II. of the Discussion. In part III. of the Discussion, the majority applies *People v. Dunn* (2022) 81 Cal.App.5th 394 (opn. mod. and ordered pub. July 20, 2022) (*Dunn*) and its invocation of a harmless error analysis to conclude defendant is not entitled to resentencing under Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567 or Sen. Bill 567). I respectfully decline to join in the majority's reasoning and conclusions in this regard.

Defendant was sentenced to an upper term under former section 1170 of the Penal Code on counts 1 and 4.[1] The former version of the statute permitted the sentencing court broad discretion to select the appropriate term of imprisonment articulated for the crime committed among three permissible options: low, middle, or upper. The sentencing court was allowed to find and weigh aggravating and mitigating circumstances and, based on the circumstances, was free to select any one of the terms it believed best served the interests of justice.

Senate Bill 567 significantly altered this sentencing scheme and the new law limits a trial court's discretion to impose an upper term: "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term .…" (§ 1170, subd. (b)(1).) Presumptively, the middle term is now the maximum term that may be imposed and it may be exceeded "only when there are circumstances in aggravation of the crime that justify imposition of a term of imprisonment exceeding the middle term .…" (*Id.*, subd. (b)(2).) In addition, the facts underlying those circumstances must be proven, admitted or evidenced in a specific manner not required under the former law. (*Ibid.*)

---

[1]    Further statutory references are to the Penal Code unless otherwise stated.

Presumptions affecting the trial court's sentencing discretion that are enacted in new legislation or by judicial precedent have been recognized as key ameliorative changes in the law, including those implemented by Senate Bill 567. Further, the Courts of Appeal have uniformly agreed the Legislature intended Senate Bill 567 to be applied retroactively. In this situation, similar to other ameliorative and retroactively applied law that affects a court's sentencing discretion, the standard articulated by the California Supreme Court in *People v. Gutierrez* (2014) 58 Cal.4th 1358, 1382 (*Gutierrez*) governs and ultimately requires resentencing unless the record clearly indicates the trial court would have imposed the upper term had it known of the new presumptive middle term.

In *Gutierrez*, the Supreme Court considered a retroactive change in the trial court's sentencing discretion based on a presumption that mirrors the one at issue here. The *Gutierrez* court interpreted section 190.5, subdivision (b) (section 190.5(b) or § 190.5(b)), which provided that the penalty for 16- to 17-year-old juveniles convicted of special-circumstance murder shall be life without the possibility of parole (LWOP) or 25 years to life at the court's discretion. At that time, appellate and trial courts had long construed this provision as establishing LWOP as the presumptive term. The Supreme Court held that section 190.5(b) contained no such presumption and explained that, "Although the trial courts in these cases understood they had some discretion in sentencing, the records do not clearly indicate that they would have imposed the same sentence had they been aware of the full scope of their discretion. Because the trial courts operated under a governing presumption in favor of [LWOP], we cannot say with confidence what sentence they would have imposed absent the presumption." (*Gutierrez, supra*, 58 Cal.4th at p. 1391.)

The *Gutierrez* court observed that courts previously supporting the LWOP presumption believed the statute expressed a preference for LWOP as the "'generally mandatory'" punishment and that "'*the court's discretion is concomitantly circumscribed to that extent.*'" (*Gutierrez, supra*, 58 Cal.4th at p. 1370, italics added, quoting *People v.*

2.

*Guinn* (1994) 28 Cal.App.4th 1130, 1142.) In *Gutierrez*, the change in the law retroactively expanded the trial court's sentencing discretion by eliminating a presumption in favor of LWOP. Here, the change in the law retroactively restricts the sentencing court's discretion by adding an express presumption in favor of a sentence not exceeding the middle term. Directly pertinent here, the high court reasoned "it is one thing to say that a court, confronting [three] permissible sentencing options, may impose the harsher sentence if it finds that sentence justified by the circumstances. It is quite another to say that a court, bound by a presumption [not to exceed the middle term], must impose that sentence unless it finds good reason not to do so." (*Gutierrez, supra*, at p. 1382.)

The trial court in this case made its sentencing decision in the absence of the new presumption against exceeding the middle term, and the record does not clearly indicate that the court would have imposed the upper term had it been aware of the new constraint on its discretion. I believe *Gutierrez* is binding and the appropriate remedy is to remand for the sentencing court to exercise its newly informed and circumscribed discretion in the first instance.

The majority's departure from the Supreme Court's clear indication test appears to be predicated upon the proposition that Senate Bill 567 did not change the trial court's sentencing discretion and only changed the manner in which aggravating circumstances must be proved. This approach necessarily is based on what I believe is an unreasonable interpretation of the amended version of section 1170, subdivision (b) (section 1170(b) or § 1170(b)), as Senate Bill 567 amended the statute in more than one way. In subdivision (b)(1), the Legislature established a clear and express new preference in sentencing of the type the Supreme Court has explained affects the trial court's discretion that did not exist in the prior version. If the Legislature did not intend to alter the sentencing court's discretion in this manner, it simply could have left intact the language articulating the prior standard. Contrary to the rules of statutory interpretation, the

majority gives no effect to the not-to-exceed language and the change in sentencing discretion it manifests. Rather, they bypass subdivision (b)(1) and give effect only to how the facts underlying aggravating circumstances must be proved, admitted or evidenced under subdivision (b)(2) and (b)(3). The fact is, in the context of upper term sentences, no court embracing a harmless error analysis to preclude resentencing under Senate Bill 567 acknowledges the extent of the changes in the law, meaningfully addresses *Gutierrez*, or explains their departure from *Gutierrez*'s governing standard.

I agree that a harmless error analysis may be applied to test an original upper term sentence for legal viability under the Sixth Amendment and the new law as it relates to how facts underlying the aggravating circumstances are determined. If, in imposing an upper term, the trial court relied on aggravating circumstances not admitted or proved as Sixth Amendment principles and the amended statute require, reversal may not be necessary if one or all of the circumstances are deemed harmlessly considered under a prejudicial error analysis.

This analysis, however, is only probative of whether the sentence is invalid and remand is mandated, not whether resentencing is precluded. In the event that none of the aggravating circumstances are supported by facts properly or harmlessly found, an upper term is not even legally viable under the new law and remand is required without the necessity of further inquiry. On the other hand, if any or all of the aggravating circumstances were properly or harmlessly considered, then the upper term *could* be imposed if the statute's other provisions are satisfied. But applying a harmless error test for this purpose, in my view, cannot resolve whether the trial court *would*, with the benefit of the new presumption against exceeding the middle term, exercise its newly circumscribed discretion and nonetheless impose the upper term.

To answer the latter question of what the trial court *would* do, my colleagues here and in *Dunn*, along with other courts, apply a second harmless error analysis to gauge the likelihood of what sentence the trial court would impose on resentencing based on their

4.

calculation of reasonable probabilities. How a trial court would balance the circumstances under a new standard of discretion in the first instance, however, should not be a matter of estimating the odds. I agree a second inquiry is necessary, but I would apply *Gutierrez* and ascertain whether the record clearly indicates that the trial court would make the same sentencing decision notwithstanding the new constraint on its discretion. The clear indication test requires more than a showing that the trial court's original imposition of the upper term simply is supported by one or more of the aggravating circumstances properly or harmlessly considered. It requires a new evaluation and weighing of the circumstances by the sentencing court that starts with the awareness that the new statutory preference bears on its discretion. To do otherwise is to conflate this starting preference with the necessary procedural requirements for finding aggravating circumstances that justify overcoming it.

A harmless error approach to determine how the trial court would exercise its newly informed discretion unnecessarily injects a layer of speculation into the inquiry that is out of step with *Gutierrez* and effectively places the sentencing decision in the hands of the appellate court. Importantly, it deprives the defendant of a fair opportunity to obtain all of the ameliorative benefits of the new law, and precludes the defendant from a sentencing determination made in the exercise of informed discretion. In sum, while a harmless error test may be utilized to test an upper term sentence for legal viability as a threshold inquiry, *Gutierrez* guides any subsequent analysis determinative of resentencing. When I apply that framework here, defendant is clearly entitled to resentencing. Therefore, I respectfully dissent from the majority's reasoning and conclusion in part II. of the Discussion.

## II.     Applicable Legal Background and Principles

Prior to January 1, 2022, former section 1170(b) provided that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court.… The

5.

court shall select the term which, in the court's discretion, best serves the interests of justice.…"

Senate Bill 567 amended section 1170(b), and it now provides that "[w]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (*Id.*, (b)(1).) "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial…." (*Id.*, (b)(2).)

The genesis of the harmless error analysis to measure the need for resentencing upon retroactive application of Senate Bill 567 appears rooted in how the Sixth Amendment is implicated by section 1170(b)(1)'s prohibition on exceeding the middle term and the new state law requirements for proving aggravating circumstances. In general terms, former section 1170(b) did not restrict a trial court's discretion to impose an upper term, so a Sixth Amendment jury trial right did not attach to the aggravating-circumstance findings used to support an upper term; the trial court was free to make these findings itself without a jury.

In retroactively restricting a court's discretion to impose the upper term under the new law, a jury trial right *retroactively attaches* to the aggravating-circumstance findings made to support that upper term under the former law.[2] The new procedural requirements in section 1170(b)(2) (which address this Sixth Amendment issue) *also retroactively attach* to the original sentencing decision. The resulting question is whether

---

[2]   As I indicate, *post*, a Sixth Amendment jury trial right does not attach to the fact of a prior conviction or facts the defendant has admitted.

6.

aggravating-circumstance findings made by the court without a jury survive constitutional and state law scrutiny. The focus of the harmless error analyses deployed to consider retroactive application of Senate Bill 567 revolve exclusively around this question, *but none accounts for how retroactively limiting the sentencing court's discretion also precludes the original sentencing decision from being a fully informed one*.

Accordingly, to explicate my position in full context, I begin my analysis with the Sixth Amendment and its relevance to Senate Bill 567 and section 1170(b).

### A. Sixth Amendment Implications

#### 1. Sixth Amendment and California's Determinate Sentencing Law (DSL)

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*).) As such, "the Federal Constitution's [Sixth Amendment] jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Cunningham v. California* (2007) 549 U.S. 270, 274–275 (*Cunningham*).) "[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (*Blakely v. Washington* (2004) 542 U.S. 296, 303–304 (*Blakely*).)

California's DSL in effect from 1977 to 2007 assigned to the trial judge, not a jury, the authority to find facts that exposed a defendant to an elevated upper term sentence. The pre-2007 version of section 1170(b), provided that "the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime." (Stats. 1976, ch. 1139, § 273, pp. 5140–5141, as amended by Stats. 1977, ch. 165, § 15, pp. 647–649.) The circumstances in aggravation or mitigation

7.

were to be determined by the court after consideration of the trial record; the probation officer's report; statements in aggravation or mitigation submitted by the parties, the victim, or the victim's family; and any further evidence introduced at the sentencing hearing. (Stats 1976, ch. 1139, § 273, pp. 5140–5141; see *Cunningham, supra*, 549 U.S. at p. 277, citing § 1170, former subd. (b).) The California Rules of Court provided that "[c]ircumstances in aggravation" were to be "established by a preponderance of the evidence." (Cal. Rules of Court, former rule 4.420(b).)

In 2007, the United States Supreme Court held this sentencing scheme violated the Sixth Amendment's jury-trial guarantee as articulated in *Apprendi* and *Blakely* because it allowed a sentencing judge to impose a term beyond the statutory maximum based on facts not proven to a jury beyond a reasonable doubt or admitted by the defendant. (*Cunningham, supra*, 549 U.S. at p. 293.) The high court explained "California's DSL, and the Rules governing its application, direct the sentencing court to start with the middle term, and to move from that term only when the court itself finds and places on the record facts—whether related to the offense or the offender—beyond the elements of the charged offense." (*Id.* at p. 279.) Applying *Apprendi* and *Blakely*, the court concluded the middle term under California's DSL was the relevant statutory maximum. (*Cunningham, supra*, at p. 288.) To the extent the DSL allowed a sentencing judge to find facts necessary to impose a punishment exceeding the middle term that were neither established by the jury's verdict, the defendant's admissions, or the defendant's prior convictions, the system did not "withstand measurement against [the court's] Sixth Amendment precedent." (*Cunningham, supra*, at p. 293.)

Applying *Cunningham* in *People v. Black* (2007) 41 Cal.4th 799 (*Black II*), the California Supreme Court addressed whether the imposition of the upper term in the circumstances of Black's case violated the Sixth Amendment. Black argued he had a right to a jury trial on all aggravating circumstances that may be considered by the sentencing court in imposing the upper term, even if one aggravating circumstance was

8.

established in accordance with *Blakely*. (*Black II, supra*, at p. 814.) This was so, Black argued, because selection of the upper term was justified only when the circumstances in aggravation outweigh the circumstances in mitigation—thus, a court could not impose the upper term unless it determined that any aggravating circumstances were of sufficient weight to justify the upper term. (*Ibid.*) Accordingly, Black asserted, "if only one of several aggravating circumstances considered by the trial court has been established pursuant to Sixth Amendment requirements, and the upper term sentence is selected, the court has imposed 'punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," [citation] and the judge exceeds his proper authority.'" (*Black II, supra*, at p. 814, quoting *Blakely, supra*, 542 U.S. at p. 304.)

Our high court rejected this argument. The court observed that "under the line of high court decisions beginning with *Apprendi*, …, and culminating in *Cunningham*, …, the constitutional requirement of a jury trial and proof beyond a reasonable doubt applies only to a fact that is 'legally essential to the punishment' (*Blakely, supra*, 542 U.S. at p. 313), that is, to 'any fact that exposes a defendant to a greater potential sentence' than is authorized by the jury's verdict alone (*Cunningham, supra*, 549 U.S. at p. [281])." (*Black II, supra*, 41 Cal.4th at p. 812.) "'The Sixth Amendment question, the Court has said, is whether the law *forbids* a judge to increase [the] defendant's sentence *unless* the judge finds facts that the jury did not find (and the offender did not concede).' (*Rita v. United States* (2007) 551 U.S. [338, 352].)" (*Ibid.*)

Under California's pre-2007 determinate sentencing scheme, the sentencing court was required to order imposition of the middle term unless there were circumstances in aggravation or mitigation of the crime. (*Black II, supra*, 41 Cal.4th at p. 808, citing § 1170, former subd. (b).) Under this framework, the court pointed out, the presence of one aggravating circumstance made it lawful for the trial court to impose an upper term sentence. (*Black II, supra*, at p. 813.) So long as one aggravating circumstance was

9.

established in accordance with the constitutional requirements, the defendant was no longer entitled to the middle term, and the upper term became the statutory maximum for Sixth Amendment purposes. (*Black II, supra*, at p. 813.) The court explained further that a sentencing court's "factual findings regarding the existence of additional aggravating circumstances may increase the likelihood that it actually will impose the upper term sentence, but these findings do not themselves further raise the authorized sentence beyond the upper term. No matter how many additional aggravating facts are found by the court, the upper term remains the maximum that may be imposed. Accordingly, judicial factfinding on those additional aggravating circumstances is not unconstitutional." (*Id.* at p. 815.)

Based on this, the *Black II* court held "as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in accordance with the requirements of *Apprendi* and its progeny, any additional factfinding engaged in by the trial court in selecting the appropriate sentence among the three available options does not violate the defendant's right to jury trial." (*Black II, supra*, 41 Cal.4th at p. 812.)

Applying this reasoning to the facts before it, our high court noted one of the aggravating facts the trial court relied on to impose the upper term sentence was that force was used against the victim to commit the underlying crime, a fact that was necessarily presented to the jury in the form of a special allegation.[3] This aggravating circumstance, the court reasoned, rendered Black *eligible* for the upper term under section 1170. (*Black II, supra*, 41 Cal.4th at p. 817.) Beyond that, the trial court had relied on Black's numerous prior convictions as an aggravating circumstance, which the

---

[3] The jury had found true the allegation that Black had committed the offense by means of "'force, violence, duress, menace, and fear of immediate and unlawful bodily injury'" within the meaning of section 1203.066, subdivision (a)(1), which rendered Black ineligible for probation. (*Black II, supra*, 41 Cal.4th at pp. 816–817.)

court held came within the prior conviction exception to which no jury trial right applied. (*Id.* at pp. 818–820.)  As Black was eligible for the upper term sentence based on at least one aggravating circumstance found in compliance with the Sixth Amendment and the prior conviction exception thereto, the court concluded his right to a jury trial was not violated by imposition of the upper term sentence.  (*Black II, supra*, at p. 820.)

## 2. The Harmless Error Test for Sixth Amendment Violations in Sentencing Under the DSL

On the same day it decided *Black II*, our high court issued its opinion in *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*), which also presented a question of whether the imposition of an upper term sentence under the pre-2007 DSL violated the defendant's Sixth Amendment rights.  Different from *Black II*, none of the aggravating circumstances found by the trial court for imposing the upper term satisfied the Sixth Amendment under *Apprendi, Blakely* or *Cunningham*; all were based on the facts underlying the crime, none of which had been admitted by the defendant, established by the jury's verdict, or involved a prior conviction.  (*Sandoval, supra*, at pp. 837–838.)  The court concluded the upper term sentence violated the Sixth Amendment, but then proceeded to determine whether that error was harmless.  (*Id.* at pp. 838–843.)

The court explained the denial of a Sixth Amendment jury trial right was reviewed under the harmless error standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).  (*Sandoval, supra*, 41 Cal.4th at p. 838.)  However, the relevant question regarding the failure to submit a sentencing factor to a jury was not whether the error contributed to the verdict; rather, the question was whether the jury's verdict would have authorized the upper term sentence had the aggravating circumstance been submitted to the jury.  (*Ibid.*)  Reiterating its reasoning in *Black II* that only one aggravating circumstance renders a defendant eligible for an upper term sentence and tailoring the *Chapman* error standard to the context, *Sandoval* held that "[i]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-

11.

doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury," the error is harmless. (*Sandoval, supra*, at p. 839.)

### 3. Retroactive Application of Senate Bill 567 Implicates the Sixth Amendment

Meanwhile, in response to *Cunningham*, California's Legislature amended the DSL through urgency legislation effective March 30, 2007. (Stats. 2007, ch. 3, § 2.) The amended DSL did away with a presumptive middle term and left "the choice of the appropriate term" to the "sound discretion of the court." (Stats. 2007, ch. 3, § 2.) The jury's verdict alone was sufficient to render a defendant eligible for an upper term sentence, making the upper term the relevant statutory maximum for purposes of the Sixth Amendment, remedying the DSL's constitutional infirmity. (See generally *Apprendi, supra*, 530 U.S. at p. 481 [observing nothing in the common law history pertaining to jury trial right in criminal cases "suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute"].)

Under the changes effected by Senate Bill 567, a trial court imposing a sentence may no longer select any of the three terms that best serves the interests of justice, but must impose a sentence that does not exceed the middle term, except as provided in section 1170(b)(2). As elements of the offense being punished may not be used to impose an upper term (Cal. Rules of Court, rule 4.420(h)), a defendant is not eligible for an upper term sentence based solely on a conviction on the substantive offense—only the presence of an additional aggravating circumstance proved, admitted or evidenced in conformity with all the requirements of section 1170(b)(2) and (b)(3) will render a defendant eligible for an upper term.

Senate Bill 567 addressed the potential Sixth Amendment issue regarding upper term sentences by requiring aggravating circumstances be found, admitted or evidenced

in conformity with Sixth Amendment principles. But when Senate Bill 567 is applied *retroactively* to sentencings occurring under section 1170, former subdivision (b), the issue is whether the aggravating circumstances found by the sentencing judge and relied on to impose the upper term now comply with the Sixth Amendment and the new state law.[4]

**B.      Courts Applying a Harmless Error Analysis to Assess the Need for Resentencing on Retroactive Application of Senate Bill 567**

Apparently to address this potential issue, the Court of Appeal in *Flores* extended the harmless error test applied in *Sandoval* to assess whether an upper term sentence imposed under the former DSL required resentencing upon retroactive application of the new law. (*Flores, supra*, 75 Cal.App.5th at p. 500.) There, to impose the upper term under section 1170, former subdivision (b), the sentencing court relied on aggravating circumstances that included the defendant's numerous prior convictions and sustained juvenile delinquency petitions, and the defendant's unsatisfactory performance while on probation—he was on probation when he committed his current offenses. (*Flores, supra*, at p. 500.) To the extent these aggravating circumstances were not stipulated or found true by a jury beyond a reasonable doubt, the court applied *Sandoval* and concluded that, "beyond a reasonable doubt, the jury would have found true at least one aggravating circumstance." (*Flores, supra*, at p. 521.) The court summarily concluded remand for resentencing under the new law was unnecessary.

The appellate court in *Lopez* disagreed with *Flores* that *Sandoval* was dispositive

---

[4]      The Courts of Appeal have uniformly concluded Senate Bill 567 is an ameliorative change in the law that applies retroactively. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039; accord, *People v. Flores* (2022) 75 Cal.App.5th 495, 500–501 (*Flores*); *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 (*Lopez*); *People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 (*Zabelle*); *Dunn, supra*, 81 Cal.App.5th at p. 403; see *People v. Wandrey* (2022) 80 Cal.App.5th 962, 981 (*Wandrey*) [accepting parties' concession Sen. Bill 567 is ameliorative and applies retroactively]; see also *People v. Salazar* (2022) 80 Cal.App.5th 453, 462 [same].)

13.

as to resentencing in the context of Senate Bill 567, and fashioned a different harmless error analysis: "The question of prejudice under retroactive application of the revised triad system involves a two-step process, neither of which includes a determination as to whether the trial court relied on a single, or even a few, permissible factors in selecting an upper term. Rather, under the new version of the triad system set forth in section 1170, the initial relevant question for purposes of determining whether prejudice resulted from failure to apply the new version of the sentencing law is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term. If the answer to this question is 'yes,' then the defendant has not suffered prejudice from the court's reliance on factors not found true by a jury in selecting the upper term. However, if the answer to the question is 'no,' we then consider the second question, which is whether a reviewing court can be certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836, that the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied." (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11.)

The trial court in *Lopez* had imposed an upper term sentence for one of the defendant's offenses based on nine aggravating factors that related to the nature of the crimes, how they were committed, and the danger to society the defendant posed; numerous prior convictions increasing in seriousness; a prior prison term served; and unsatisfactory performance on probation, mandatory supervision and postrelease community supervision or parole. (*Lopez, supra*, 78 Cal.App.5th at p. 464, fn. 8.) Most of these factors were not found true beyond a reasonable doubt by a jury, nor were they admitted by the defendant.

14.

On appeal, the court concluded that upon retroactive application of Senate Bill 567, the improper consideration of aggravating circumstances could not be deemed harmless unless it could be determined beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every* aggravating circumstance on which the court relied in imposing the upper term—the adapted *Chapman* harmless error test articulated in *Sandoval* for Sixth Amendment jury-trial right violations. (*Lopez, supra*, 78 Cal.App.5th at pp. 465–466.) The court rejected the People's suggestion that resentencing was unnecessary because the trial court had relied on one permissible circumstance. (*Id*. at pp. 466–467 & fn. 10.) The court reasoned that while "unquestionably the trial court may still rely on any single permissible aggravating factor to select an upper term sentence under the newly revised triad system" (*id*. at p. 467), state law required all aggravating circumstances to be found true by a jury beyond a reasonable doubt, admitted by the defendant, or constitute a prior conviction (*id*. at p. 466). From the facts before it, the court found several aggravating circumstances did not pass scrutiny under the adapted *Chapman* harmless error test. (*Lopez, supra*, at pp. 465–468.)

The court reasoned that when not all aggravating circumstances could be deemed harmlessly considered, a second relevant prejudice question must be addressed: whether the court *would* have exercised its discretion to impose the upper term on less than all the aggravating circumstances originally relied upon. (*Lopez, supra*, 78 Cal.App.5th at p. 467.) Notably applying *Gutierrez*, the court remanded for resentencing under the new law because the record did not clearly indicate the trial court would have exercised its discretion to impose an upper term based solely on a single permissible aggravating circumstance or some constellation of permissible aggravating circumstances less than all it had originally relied upon. (*Lopez, supra*, at pp. 467–468.)

Somewhat differently in *Wandrey*, the court concluded that, to determine whether resentencing is warranted under the new law, the harmless error test under *Sandoval* did

15.

not encompass the separate variable that Senate Bill 567 posed in "changing the framework within which the trial court exercises its discretion by specifying a legislatively determined presumptive sentence." (*Wandrey, supra*, 80 Cal.App.5th at p. 982.) Thus, instead of relying on *Sandoval* exclusively to determine whether resentencing was necessary, the court cited *Lopez* and applied a slightly modified resentencing test, assessing whether it was "certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term." (*Wandrey, supra*, at p. 982.) Applying this framework, the court remanded for resentencing, reasoning it would require "[s]ome degree of speculation" to conclude the jury would have agreed with the court's evaluation of the aggravating circumstances relied upon or that the trial court would have exercised its sentencing discretion the same way if it had taken the statutory presumption of the middle term into account. (*Id.* at p. 983.)

In *Dunn*, a panel of this court recently adopted *Lopez*'s analysis, but altered it slightly to incorporate a *Watson*[5] harmless error test into the first prong. (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410.) Like *Lopez*, the court in *Dunn* concluded that if all aggravating circumstances relied on by the trial court were permissibly or harmlessly considered, then resentencing is not warranted. (*Dunn, supra*, at p. 410.) However, *Dunn* disagreed with *Lopez*'s conclusion that a *Chapman*-style harmless error test applied to evaluate *all* of the aggravating circumstances in making this determination. (*Dunn, supra*, at pp. 409–410.) The court reasoned that if a single aggravating circumstance is relied on in accordance with Sixth Amendment principles, or was harmlessly relied upon as articulated in *Sandoval*, the upper term sentence is constitutionally viable under the new law. (*Dunn, supra*, at p. 409.)

---

**5**     *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

16.

As such, *Dunn* reasoned, whether any other aggravating circumstances were permissibly considered to impose the upper term implicates an issue of state law only (*Dunn, supra*, 81 Cal.App.5th at pp. 409–410); thus, if additional circumstances were not considered in compliance with the new requirements under section 1170(b)(2) and (b)(3), then *Watson* provides the applicable harmless error test as to those circumstances, rather than the *Chapman*-style harmless error test applied in *Lopez*. (*Dunn, supra*, at pp. 409–410.) If all aggravating circumstances were proven to the respective standards, the court concluded any error is harmless and resentencing is not warranted. (*Id.* at p. 410; see *Zabelle, supra*, 80 Cal.App.5th at p. 1112 [articulating same two-part harmless error test and considering aggravating circumstances under *Sandoval* and *Watson* to evaluate need for resentencing under Sen. Bill 567].) If not, *Dunn* explained, a second step is necessary to determine whether, under *Watson*, there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps of the analysis. (*Dunn, supra*, at p. 410.)

In applying this framework, the *Dunn* court concluded from the record before it that two aggravating circumstances relied on by the sentencing court were found in compliance with Sixth Amendment principles and in compliance with the new state law. (*Dunn, supra*, 81 Cal.App.5th at p. 410.) As to one other aggravating circumstance not found in compliance with the new state law, the court applied *Watson* and concluded any error in relying on that circumstance was harmless. (*Dunn, supra*, at pp. 410–411.) As all the aggravating circumstances considered by the sentencing court were either permissibly or harmlessly relied upon, the court held any error in imposing an upper term sentence under the new law was harmless, no analysis at the second step was necessary, and resentencing was not warranted. (*Id.* at p. 411.)

17.

C.      **Limited Applicability of Harmless Error Test**

      1.      **Harmless Error Test Cannot Preclude Resentencing**

Regardless of the variance in the harmless error tests articulated in the cases above, two questions have emerged as the relevant inquiry to determine whether upper term sentences imposed under section 1170, former subdivision (b), require resentencing under section 1170(b) as amended by Senate Bill 567. First, there is a question whether, in light of the aggravating circumstances relied on to originally impose an upper term sentence, the upper term could still be legally imposed under federal and state law. The second relevant question, as articulated in *Lopez*, *Dunn* and *Wandrey*, involves an evaluation of whether a trial court would impose an upper term sentence under the new law.

While I generally agree with this basic framework, no application of the harmless error test can be properly employed to preclude resentencing. The *Flores* court's evaluation of aggravating circumstances under *Sandoval* is relevant to whether resentencing is mandated as a constitutional matter: if, on retroactive application of the new law, improper consideration of aggravating circumstances in imposing an upper term prejudicially violates a defendant's jury trial right under the Sixth Amendment, then resentencing would be required. But the inverse proposition, as *Flores* applied the test, is not truly conclusive of the need for resentencing: an upper term sentence that *passes* muster under a Sixth Amendment harmless error test (*Sandoval*) informs only whether the sentence could be legally imposed under the Sixth Amendment given the aggravating circumstances relied upon.

As I will explain below, this fails to consider whether a trial court would exercise its newly circumscribed discretion under section 1170 to impose an upper term in the first instance. Recognizing this issue, *Wandrey* held that application of the *Sandoval* harmless error test as applied in *Flores* is not necessarily dispositive of the need for resentencing under Senate Bill 567. (*Wandrey, supra*, 80 Cal.App.5th at p. 982 [harmless error test for

18.

6th Amend. does not take into account the changed framework under which the court now exercises its discretion under Sen. Bill 567].)

In this regard, the *Lopez* analysis suffers a shortcoming similar to *Flores.* *Lopez* states that if *all* the aggravating circumstances were properly considered under the new law or harmlessly considered under a *Chapman*-style harmless error test,[6] then the defendant has suffered no prejudice, and the second question is not relevant—i.e., no resentencing is warranted. (*Lopez, supra*, 78 Cal.App.5th at pp. 466–467, fns. 10 & 11.) Although applying a modified harmless error analysis at this first step, *Dunn* too concludes that if all aggravating circumstances were properly or harmlessly considered under federal and state law, then resentencing is unwarranted. Yet, similar to *Flores,* the fact that aggravating circumstances were permissibly or harmlessly considered reveals only that the upper term could be imposed under federal and new state law given the aggravating circumstances considered, not whether a court would still impose an upper term in light of the court's now curtailed sentencing discretion to do so.[7]

These approaches focus exclusively on the new procedural requirements for

---

[6]     *Lopez* relied on the Sixth Amendment harmless error test articulated in *People v. French* (2008) 43 Cal.4th 36, which, in turn, relied on *Sandoval*. (*People v. French, supra*, at p. 53.)

[7]     For this reason, I am skeptical that *Lopez* applied a *Chapman*-style harmless error test to *all* aggravating circumstances not proven, admitted or evidenced because it believed it was a *constitutional* prerequisite to imposing an upper term. For one thing, *Lopez* did not articulate any doubts that *Sandoval* and *Black II*'s application of *Apprendi* (only one aggravating circumstance found in compliance with the 6th Amend., or impermissibly but harmlessly found by the sentencing court, is required to pass constitutional scrutiny) remained viable under the new sentencing framework. But, more importantly, *Lopez* indicated that if all the aggravating circumstances could not pass through the harmless error test (meaning, some were harmfully considered), only then would a second prejudice test be necessary. (*Lopez, supra*, 78 Cal.App.5th at p. 466, fn. 10.) Logically, if all of the aggravating circumstances must pass scrutiny under the Sixth Amendment or the relevant harmless error test, the fact that some of them cannot meet those standards means the sentence is no longer constitutionally sound, and there would be no need to consider the second question because resentencing would be required.

19.

aggravating circumstances, giving no effect or consideration to section 1170(b)(1) or the language employed in section 1170(b)(2). Determining the best method to assess the *effects* of a changed law requires an examination of what actually changed; to do that, we must turn to the statute itself.

### 2. Section 1170(b) Circumscribes Trial Court's Sentencing Discretion

"The proper interpretation of a statute is a question of law we review de novo." (*People v. Lewis* (2021) 11 Cal.5th 952, 961.) In cases involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose, and courts begin by examining the statute's words, giving them a plain and commonsense meaning. (*Ibid.*) "'"[W]e look to 'the entire substance of the statute … in order to determine the scope and purpose of the provision …. [Citation.]' [Citation.] That is, we construe the words in question "'in context, keeping in mind the nature and obvious purpose of the statute …." [Citation.]' [Citation.] We must harmonize 'the various parts of a statutory enactment … by considering the particular clause or section in the context of the statutory framework as a whole.'"'" (*Ibid.*)

The former version of section 1170(b) provided as follows:

> "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the choice of the appropriate term shall rest within the sound discretion of the court. At least four days prior to the time set for imposition of judgment, either party or the victim, or the family of the victim if the victim is deceased, may submit a statement in aggravation or mitigation. In determining the appropriate term, the court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing. The court shall select the term which, in the court's discretion, best serves the interests of justice. The court shall set forth on the record the reasons for imposing the term selected and the court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law. A term of

20.

imprisonment shall not be specified if imposition of sentence is suspended." (§ 1170, former subd. (b).)

Senate Bill 567 significantly altered this framework. The Legislature amended section 1170(b) and added newly enumerated section 1170(b)(1), which states,

> "When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170(b)(1).)

Section 1170(b)(1) supplies the court with full discretion to select either the lower or the middle term, but it plainly and expressly commands the court "not to exceed" the middle term—a definite and clear phrase meaning not to surpass. This prohibition is new, and it is a sea change from former section 1170(b), which allowed the court full discretion to select an upper term so long as it best served the interests of justice. This limitation circumscribes the sentencing court's discretion to exceed a middle term in exactly the manner described in *Gutierrez*. (*Gutierrez, supra*, 58 Cal.4th at p. 1382 [a statutory preference in favor of a particular sentence does not eliminate a court's discretion, but it does circumscribe it].) The majority's analysis gives no effect to section 1170(b)(1); rather, it focuses solely on section 1170(b)(2) and the procedural requirements for proving aggravating factors.

Section 1170(b)(2) states, in relevant part,

> "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial…." (§ 1170(b)(2).)[8]

---

[8] Some aspects of former section 1170(b) were unchanged and simply renumbered under the new law, including that statements in aggravation and mitigation may be submitted before judgment is imposed, the records the court may consider (§1170(b)(4)), the court's obligation to set forth on the record the facts and reasons for choosing the sentence imposed (§ 1170(b)(5)); and the preclusion from imposing an upper term using

This is fully consistent with section 1170(b)(1). Section 1170(b)(1)'s proscription on exceeding the middle term is not followed in section 1170(b)(2) by a discretionary option to select an upper term sentence if, in the court's discretion, such a sentence is warranted based on aggravating circumstances. There is no *in-the-court's-discretion* language prefacing this exception. It is not framed electively as an *unless* or an *or* option, but as an exception that may occur "only when" aggravating circumstances "justify" it. (*Ibid.*)

The statute does not simply allow a court to select an upper term because it best serves the interests of justice or because it appears warranted or supported. Instead, in distinct contrast with the former sentencing scheme, the court's decision to impose an upper term is now expressly framed around whether circumstances justify invoking the exception to the rule that the middle term is the default maximum sentence. Contrary to the majority's approach, section 1170(b)(1)'s words directing the sentencing court "not to exceed the middle term" are not rendered superfluous under section 1170(b)(2).

Far from undercutting section 1170(b)(1)'s rule, section 1170(b)(2) underscores that the middle term is the presumptive maximum term. In contrast to former section 1170(b), there must be justifying reasons and facts to exceed the middle term— the court no longer has full discretion to impose an upper term. Those reasons and facts must be proven to the new standards articulated in section 1170(b)(2), or involve a prior conviction as articulated in section 1170(b)(3). Section 1170(b)(2) focuses on these two aspects in equal measure—one is the justification necessary to overcome the default middle term maximum, and the other is how that justification is to be proven and/or established.

The plain language of this framework bakes in a presumption the middle term is

---

the fact of any enhancement upon which sentence is imposed under any provision of law (*ibid*).

the default maximum sentence. (See *Wandrey, supra*, 80 Cal.App.5th at p. 982 [noting new law specifies a statutory presumption in favor of the middle term]; see also *People v. Flores, supra*, 73 Cal.App.5th at p. 1038 [one ameliorative benefit of Sen. Bill 567 is presumptive middle term maximum].) Senate Bill 567's legislative history is express as to the existence of this presumption: "SB 567 creates a presumption of sentencing judg[]ment not to exceed the middle terms .…" (Sen. Rules Com., Office of Sen. Floor Analyses, voting on Sen. Bill 567 (2020–2021 Reg. Sess.) as amended Sept. 3, 2021, p. 4 [quoting bill author's comments].)[9]

Had the Legislature been concerned only with the burden and method of proof of aggravating circumstances to impose an upper term, it could have retained the post-2007 sentencing structure allowing the trial court to select any of the three terms in its discretion, and simply required the circumstances supporting an upper term be proven to the standards articulated in Senate Bill 567. Instead, it chose to expressly bind a sentencing court to a middle-term maximum sentence to be exceeded "only when" aggravating circumstances justify it. (§ 1170(b)(2).) How extensively the court's sentencing discretion has been limited by this embedded presumption is a question only of degree; the fact *that* the court's discretion has been meaningfully circumscribed is

---

[9]     The author's comments that Senate Bill 567 created a presumption of sentencing judgment not to exceed the middle terms was followed by the phrase "unless there are circumstances in aggravation of a crime that justify the imposition of the upper term." (Sen. Rules Com., Office of Sen. Floor Analyses, voting on Sen. Bill 567 (2020–2021 Reg. Sess.) as amended Sept. 3, 2021, p. 4 [quoting bill author's comments].) The enacted version of the law states that a "court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term .…" (§ 1170(b)(2).) The statute's wording emphasizes the presumptive nature of a sentence not exceeding the middle term that was expressly intended: it is not just that a court may impose a sentence not exceeding the middle term unless it concludes, in its discretion, an upper term is justified by aggravating circumstances; rather, it is that a court, bound not to exceed the middle term, may conclude this presumptive rule is overcome "only when" (*ibid.*) there are justifying aggravating circumstances.

patent under the language of the statute.

This new presumption under section 1170(b) is squarely analogous to the one addressed in *Gutierrez*. There, in light of *Miller v. Alabama* (2012) 567 U.S 460 (*Miller*), the court examined a judicially construed presumption under section 190.5(b) that favored a sentence of LWOP for 16- to 17-year-old juvenile offenders convicted of special circumstance murder.[10] (*Gutierrez, supra*, 58 Cal.4th at pp. 1360–1361.) In disapproving this presumption, the court explained that although a rule in favor of LWOP did not eliminate a trial court's discretion to make an individualized sentencing decision required under *Miller*, the presumption expressed a preference for LWOP and circumscribed the trial court's discretion to that extent. (*Gutierrez, supra*, at pp. 1381–1382.)

The court reasoned, "[i]t is one thing to say that a court, confronting two permissible sentencing options, may impose the harsher sentence if it finds that sentence justified by the circumstances. It is quite another to say that a court, bound by a presumption in favor of the harsher sentence, must impose that sentence unless it finds good reasons not to do so." (*Gutierrez, supra*, 58 Cal.4th at p. 1382.) Because of the presumption's effect on the trial court's discretion to select the lesser sentence, its imputation would create a serious constitutional question under *Miller*, and our high court declined to interpret section 190.5(b), to include it. (*Gutierrez, supra*, at p. 1382 [given

---

**10** In *Miller*, "the United States Supreme Court ruled that 'mandatory [LWOP] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on "cruel and unusual punishments,"' relying extensively on differences between juveniles and adults with regard to their culpability and capacity for change." (*Gutierrez, supra*, 58 Cal.4th at p. 1360.) In examining section 190.5(b) under *Miller*, the California Supreme Court in *Gutierrez* held that because the sentencing regime created by section 190.5(b) authorized and required consideration of the distinctive attributes of youth highlighted in *Miller*, there was "no constitutional infirmity with section 190.5(b) once it is understood not to impose a presumption in favor of [LWOP]." (*Gutierrez, supra*, at p. 1361.)

*Miller*'s conception of a proper individualized sentencing inquiry, a "serious constitutional concern would arise" if § 190.5(b) were interpreted to include a rule circumscribing the court's discretion by presuming in the first instance LWOP is the appropriate sentence for special circumstance murder committed by 16- or 17-year-old juvenile].)

The court ultimately concluded that LWOP sentences imposed in this context while the presumption was legally in effect could not reflect an exercise of the sentencing court's informed discretion. (*Gutierrez, supra*, 58 Cal.4th at pp. 1390–1391.) The necessary remedy was to remand for resentencing unless the record clearly indicated the trial court would have reached the same conclusion even if it had been aware of the scope of its discretion. (*Id.* at p. 1391.)

The reasoning in *Gutierrez* applies with equal force to Senate Bill 567's presumptive middle term maximum that can be exceeded only when aggravating circumstances are deemed to justify it. Newly enacted section 1170(b)(1) and (b)(2) state an explicit preference for a middle term maximum sentence that was merely inferable about LWOP from the language of section 190.5(b). These two subdivisions of section 1170(b) circumscribe the court's discretion by creating an express rule that, in the first instance, the middle term is the maximum appropriate sentence just as the interpreted rule in favor of the harsher sentence in *Gutierrez* limited the trial court's discretion by presuming, in the first instance, LWOP was the appropriate sentence. (*Gutierrez, supra*, 58 Cal.4th at p. 1382.) Both presumptions place weight on the scale in the direction of the sentence they favor before any surrounding circumstances are even considered.

The majority contends any presumption of a middle term maximum sentence has no effect on the court's discretion to select an upper term when aggravating circumstances exist to justify departure from section 1170(b)(1)'s rule, but a similar argument was rejected in *Gutierrez*. (*Gutierrez, supra*, 58 Cal.4th at pp. 1381–1382.) Although the LWOP presumption did not eliminate the court's sentencing discretion to

make an individualized sentencing decision and impose a lesser life sentence if appropriate, the court explained the effect of the presumption still meaningfully circumscribed the court's discretion. (*Ibid.*)

The discretionary limitation here means any weighing of aggravating circumstances must occur under the lens of the new rule favoring the middle term as the maximum sentence. For example, suppose a trial court imposed an upper term sentence based on one aggravating circumstance of prior convictions. If that circumstance was deemed properly considered under *Apprendi* and properly (or harmlessly) considered under the new state law requirements, a sentencing court might very well yet conclude under the new sentencing scheme that the exception for exceeding the now-presumptive middle term maximum is not justified by that single aggravating circumstance. (See *Gutierrez, supra*, 58 Cal.4th at p. 1382 ["When the choice between two sentences must be made by weighing intangible factors, a presumption in favor of one sentence can be decisive in many cases."].)

For this reason, *any* prejudice analysis applied to the aggravating circumstances originally considered addresses only whether the upper term could be legally imposed under the new law. Even if *all* of the aggravating circumstances could be deemed permissibly considered or harmlessly so under a harmless error test (whether that is a *Chapman*-style test or a *Watson*-style test or a combination of the two), we are still left with the question of whether a sentencing court would impose an upper term under the newly altered sentencing framework. (*Gutierrez, supra*, 58 Cal.4th at pp. 1367, 1391 [sentencing court's statement that it had "'thought long and hard about what punishment is appropriate'" and was "'absolutely convinced'" that LWOP was the "'only thing that the Court can do that could redress'" violence inflicted in the case did not clearly indicate LWOP would again be imposed in the absence of the judicially construed statutory preference for LWOP].)

In light of this new presumptive maximum middle term, *Flores*, *Lopez* and *Dunn*

26.

do not explain how proper consideration (let alone *harmless* consideration) of one or all of the aggravating circumstances under the new law reflects a sentencing decision made in the exercise of informed discretion or how it ensures a defendant has had a fair opportunity to obtain the ameliorative benefit of the law. All defendants are entitled to the former (*People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8), and defendants whose judgments of conviction are not final for *Estrada* purposes are entitled to the latter (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307).

Consistent with my interpretation of section 1170(b) and application of *Gutierrez*, the imposition of an upper term under the former sentencing scheme cannot reflect an exercise of informed discretion under the new law. As a result, any harmless error approach is inadequate to measure the effect of the new presumption on the original sentencing decision. (*Gutierrez, supra*, 58 Cal.4th at pp. 1381–1382, 1390–1391.)

At best, all that can be ascertained in a threshold application of the harmless error analysis is whether a court could legally impose an upper term sentence under the new law given the circumstances considered, not that it would do so in the exercise of its informed discretion in the first instance.

### 3. Once Upper Term is Deemed Legally Viable Under the New Law, the Need for Resentencing Must Be Assessed Under *Gutierrez*, Not Another Harmless Error Analysis

When not all of the aggravating circumstances relied on at the original sentencing hearing were properly or harmless considered under the new law, courts such as *Lopez* and *Dunn* invoke a second harmless error analysis to ascertain whether there is a reasonable probability the sentencing court would have imposed a lesser term had it not considered the improper circumstances. For the same reasons articulated above, I depart from *Lopez* and *Dunn* and their adoption of *Watson* to guide this inquiry.

The harmless error test under *Watson* has indeed been applied in cases where a sentencing court considered improper sentencing factors. (See *People v. Price* (1991) 1

27.

Cal.4th 324, 492 (*Price*); see also *People v. Avalos* (1984) 37 Cal.3d 216, 233 (*Avalos*).) But, in those cases, the underlying sentencing scheme had not changed in the interim. The sentencing court revealed its sentencing choice under a particular sentencing scheme, and the reviewing court decided whether there was a reasonable probability the court's lawful exercise of its discretion on remand would lead it to make a different choice under the *same* sentencing framework.

While improperly considered sentencing factors may be involved in retroactive application of Senate Bill 567, that is not the only concern. As explained above, the new sentencing scheme has meaningfully altered the scope of the trial court's discretion with the new presumption. When a trial court is unaware of the full scope of its sentencing discretion because, for example, legal presumptions have shifted (*Gutierrez, supra*, 58 Cal.4th at p. 1391) or different discretionary sentencing choices exist, "an application of the 'reasonable probability standard' [under *Watson*] requires the reviewing court to decide what choice the trial court is likely to make in the first instance, not whether the court is likely to repeat a choice it already made." (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 427.)

Different from cases such as *Price* and *Avalos*, where the sole issue involved in application of *Watson* was improperly considered sentencing factors, determining what sentencing choice a trial court would make in the first instance pursuant to Senate Bill 567 becomes a far more speculative proposition under a harmless error test. Trying to assess probabilities under *Watson* in the context of Senate Bill 567 effectively recasts the reviewing court into the role of sentencing court, weighing for the first time whether particular aggravating circumstances justify exceeding the presumptive maximum middle term. Prognosticating this way carries the risk of denying a defendant one of the primary ameliorative benefits of the new law that contributes to its retroactive application in the first place, effectively thwarting the Legislature.

To avoid unnecessary speculation about what a sentencing court would do in the exercise of its *informed* discretion in the first instance under Senate Bill 567, the appropriate remedy is to remand for resentencing unless the record "'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'" (*Gutierrez, supra*, 58 Cal.4th at p. 1391.)[11]

In sum, whether resentencing of an upper term sentence is the appropriate remedy on retroactive application of Senate Bill 567 involves two relevant questions. The first is whether, given the aggravating circumstances considered, the upper term sentence *could* still be legally imposed under federal and state law. The answer to that question lies in the application of *Apprendi* and the new state law requirements under Senate Bill 567. But even if an upper term sentence could still be legally imposed given the set of aggravating circumstances relied upon, resentencing then hinges on whether a sentencing court would impose an upper term sentence under the new law. As the trial court's discretion to impose an upper term sentence has been circumscribed under the new sentencing framework, that inquiry must be made under *Gutierrez.*

## III.    Remand for Resentencing is Warranted

Turning to application of the foregoing, the relevant first question is whether, given the aggravating circumstances considered, the upper term imposed on counts 1 and 4 could still be legally imposed under federal and state law. Defendant was convicted on counts 1 and 4 for making criminal threats in violation of section 422, and the court imposed the upper term on both counts. The term for count 4 was ordered to be served concurrently with the upper term imposed on count 1.

---

[11]    Notably, although *Lopez* expressly indicated the second prong of its framework was to be assessed under *Watson* (*Lopez, supra*, 78 Cal.App.5th at p. 467, fn. 11), the court actually conducted its analysis under *Gutierrez* and concluded the record did not "clearly indicate" the trial court would have exercised its discretion to reimpose an upper term (*Lopez, supra*, at p. 468).

The trial court imposed the upper term based on the following: (1) defendant was convicted of other crimes for which consecutive sentences could have been imposed but for which a concurrent sentence will be imposed; (2) he had engaged in violent conduct, which indicated a serious danger to society; (3) his prior convictions were numerous; (4) he was on mandatory supervision and summary probation when the current offenses were committed; (5) his prior performance on probation, parole and mandatory supervision had all been unsatisfactory; and (6) there were crimes of violence on more than one occasion; threats of violence on more than one occasion in this case.

Applying *Black II* and *Sandoval*, because a defendant remains eligible for an upper term sentence based on a single aggravating circumstance under the new law, only one aggravating circumstance needs to be proven in conformity with Sixth Amendment principles (or harmlessly considered as articulated in *Sandoval*) for an upper term sentence to pass constitutional scrutiny. (*Black II, supra*, 41 Cal.4th at p. 812; *Sandoval, supra*, 41 Cal.4th at pp. 838–839; see *Flores, supra*, 75 Cal.App.5th at pp. 500–501, review denied.)[12] Similarly, as a defendant may be eligible for an upper term sentence based on a single aggravating circumstance under the new law, one aggravating circumstance found in conformance with new state law means the court could legally impose an upper term sentence under section 1170(b)(2) based solely on that circumstance. Assuming at least one of the aggravating circumstances the trial court found and relied on here is viable under the Sixth Amendment and state law, resentencing is still required under *Gutierrez*.

---

**12** To date, no court has concluded *Black II* and *Sandoval* are inapplicable in the context of Senate Bill 567 to assess constitutional error, and our Supreme Court declined to depublish *Flores* in denying review. *Lopez* applied the higher *Chapman* standard to assess whether the trial court's reliance on all aggravating circumstances was harmless, but did not explain why other than pointing to the state law requirements under section 1170(b)(2). With no argument here that the holdings in *Black II* and *Sandoval* are inapplicable in the context of Senate Bill 567, I do not reach that issue.

Even if all of the aggravating circumstances were found in accordance with section 1170(b)(2) and (b)(3), the record still does not clearly indicate the trial court would impose the upper term had it been aware of the presumptive middle term maximum sentence. At bottom, defendant was sentenced to the upper term without weighing the circumstances under the lens of the presumptive middle term maximum, and the resulting upper term was not imposed in an exercise of the trial court's informed discretion. While we might presume the trial court is likely to impose the upper term again even knowing and considering the presumption in favor of a middle term maximum sentence, that does not constitute a clear indication in the record the trial court would do so. The facts of *Gutierrez* underscore this.

At the sentencing hearing regarding Luis Gutierrez, the trial court sentenced him to LWOP, observing that notwithstanding the defendant's age, there were things about the crime itself that warranted LWOP, including the amount of violence inflicted on the victim and the resulting harm done to the victim's family. The court commented there was "'really no amount of time that could be imposed as punishment that would repay the damage [Gutierrez] has caused, not just to [the victim's] inner circle but to the community as well and the community of her family.'" (*Gutierrez, supra*, 58 Cal.4th at p. 1367.) On balance, the trial court concluded it had "'thought long and hard about what punishment is appropriate and I am absolutely convinced at this stage of the proceedings that [LWOP] is the only thing that the Court can do that could redress the amount of violence that was inflicted in this case.'" (*Ibid*.)

Notwithstanding these statements, our Supreme Court explained this record (and that in the defendant Moffett's consolidated case) did not clearly indicate the trial court would have imposed the same sentence in the absence of the presumption in favor of LWOP. (*Gutierrez, supra*, 58 Cal.4th at pp. 1390–1391.) The high court reached this conclusion *even though* aggravating circumstances deemed supportive of LWOP in Gutierrez's case (such as, the degree of violence involved, resulting harm to the victim's

31.

family and surrounding community, and defendant's unsatisfactory record while in custody) would remain unchanged on remand, and had "'absolutely convinced'" the trial court LWOP was the only sentence that could redress the violence inflicted in that case. (*Id.* at p. 1367.) The trial court's consideration of these aggravating circumstances could not transform the LWOP sentence into one reflecting an exercise of informed discretion, and it did not amount to a clear indication the trial court would have imposed LWOP without the presumption. (*Id.* at p. 1391 ["Because the trial courts operated under a governing presumption in favor of [LWOP], we cannot say with confidence what sentence they would have imposed absent the presumption."].)

The same is true here. Even though the trial court found the aggravating circumstances decidedly outweighed any in mitigation, without knowledge of new the presumptive middle term maximum, the upper term could not be imposed in the exercise of the trial court's informed discretion for the same reasons articulated in *Gutierrez*. Since there is no clear indication in the record the trial court would impose the upper term sentences again in view of the presumptive middle term maximum, defendant is entitled to resentencing.

This conclusion is based on the assumption all the aggravating factors were properly considered under the new law. In actuality, only some of the aggravating circumstances were supported by facts properly found or evidenced pursuant to section 1170(b)(2) and (b)(3). When the factual findings underlying the trial court's aggravating circumstance are examined in light of these new procedural requirements and the harmless error test employed by the majority, the need for resentencing becomes even more strikingly clear.

As a second aggravating circumstance, the trial court found defendant had "engaged in violent conduct which indicates a serious danger to society." I generally agree with the majority's conclusion that whether defendant's conduct indicates a "serious danger to society" is a subjective judgment that cannot be deemed harmlessly

32.

considered. But in reaching this determination, the majority comments "defendant had certainly engaged in violent conduct as evidenced by the fact of his present and prior violent convictions …." (Maj. opn., *ante*, at p. 29.)

None of defendant's *current* convictions are designated violent offenses by the Legislature under section 667.5, subdivision (c), and none involve any physical contact with the victims. Likewise, none of defendant's *prior* convictions (either those noted on the probation report, the rap sheet, or those found true by the trial court beyond reasonable doubt) are designated violent felonies under section 667.5, subdivision (c). In fact, most of these offenses are not necessarily felonies, they are wobblers—they may be discretionarily charged and sentenced as either misdemeanors or felonies. The rap sheet notes two prior felony offenses under section 243, subdivision (c), for battery against emergency personnel where injury was inflicted, but no other details are offered about the nature of the injury or how it occurred. The rap sheet also indicates two misdemeanor offenses were committed, one under section 245, subdivision (a)(1), and the other under section 273.5, subdivision (a). The first is an assault offense, and the second relates to the infliction of injury to a spouse or partner, but again, no details of the actual offenses are offered, and both were discretionarily charged and/or sentenced as misdemeanors rather than felonies, suggesting the facts were not especially serious.

Whether any of these offenses constitute violent conduct requires an examination of the facts underlying them and application of subjective judgment to make such a finding. Inasmuch as it is now improper for the trial court to make these types of factual determinations under section 1170(b)(2), we should not do so in the first instance on appeal, especially since we cannot say exactly what current or prior conduct the trial court *may* have been considering.

33.

This factual issue also undercuts the trial court's reliance on the sixth aggravating circumstance. In articulating this circumstance, the trial court indicated it had considered that there "are crimes of violence on more than one occasion; threats of violence on more than one occasion in this case." Only half of the facts underpinning this circumstance were proven in accordance with section 1170(b)(2): the jury found defendant guilty beyond reasonable doubt on three counts of making criminal threats under section 422, two of which were against different victims and occurred on separate days. Thus, it was necessarily proven true beyond reasonable doubt that defendant made threats of violence on more than one occasion in this case.

However, whether the current convictions or any prior convictions constitute crimes of violence was not a fact found true beyond a reasonable doubt by the jury. It is not enough that *some* facts underlying an aggravating circumstance are found or evidenced in accordance with section 1170(b)(2); the law requires "*the* facts underlying those circumstances" to be proven or evidenced in accordance with the statute. (*Ibid.*, italics added.) Characterizing as violent those crimes that do not necessarily involve death or serious bodily injury is a subjective factual assessment, as discussed above, but it is also vague because we do not even know what crimes of violence the trial court was referencing in making this finding. Even in the context of a harmless error analysis, it is difficult to determine the probability a jury would find certain crimes are violent, but it is impossible to determine how a jury would assess unspecified crimes.

It is also difficult to know how the court weighed the two facets of this aggravating circumstance (the crimes-of-violence aspect in relation to the multiple-threats-of-violence-in-this-case facet) in relation to each other. Without further elaboration from the trial court, we can only speculate how the trial court might evaluate this circumstance after sheering off some of the improperly found facts that underpin it.

In the end, the majority concedes the second circumstance was harmfully considered, and, in my view, the trial court's reliance on the sixth aggravating

34.

circumstance was predicated to some extent on the improperly determined fact that defendant's current and/or prior crimes constituted crimes of violence. After examining the aggravating circumstances under the new procedural requirements, all that remains is guesswork about how the trial court might weigh a different compilation of aggravating circumstances, with altered factual underpinnings, under a different sentencing scheme. Through no fault of the trial court, when I stack up the gutted version of these aggravating circumstances in view of the presumptive middle term maximum, it is all the more apparent resentencing is required.[13]

This record provides no clear indication the trial court would find upward departure from the new presumptive middle term maximum was justified under the existing aggravating circumstances, let alone fewer than all the aggravating circumstances with weakened factual support. As such, resentencing is required and I would remand for that purpose. (*Gutierrez, supra*, 58 Cal.4th at p. 1391.) For these

---

**13** Although it does not affect my view of the need for resentencing, I have doubts about the propriety of the first aggravating circumstance. The trial court imposed the upper terms on counts 1 and 4, but under section 669, ordered those terms be served concurrently. The court then used its determination under section 669 as an aggravating circumstance to impose the upper term on both counts. (Cal. Rules of Court, rule 4.421(a)(7) [defendant convicted of other crimes for which consecutive sentences could have been imposed but for which concurrent sentences are being imposed].)

As the majority points out, the verdict necessarily reflects the jury's conclusion there were two victims against whom defendant made criminal threats on separate occasions. As such, the jury's verdict on counts 1 and 4 reflects crimes for which consecutive sentences could have been imposed. (§ 669; Cal. Rules of Court, rule 4.425(a), (b)(1).) Yet, this fact alone is insufficient to support the aggravating circumstance because the court must still actually elect to impose a concurrent rather than a consecutive term. The occurrence of this fact arises only after the trial court's exercise of its sentencing discretion under section 669, and it is not one subject to a jury determination or a defendant's admission. I question whether the court's election to run terms concurrently under section 669 may then properly (and circularly) function as a fact proven in conformity with section 1170(b)(2) to support an aggravating circumstance used to justify an upper term.

reasons, I respectfully dissent from the majority's reasoning and conclusions in part II. of the Discussion.

MEEHAN, J.